**UNITED STATES of America, Plaintiff,**

v.

**Kurt Henry VAN ENGEL, Lyle Van Engel, Bernard K. Van Engel, Joseph L. Palmisano, Barbara A. Schwellinger, Howard F. Schaefer, Eugene E. Knoll, Larry J. Pitzen, and James A. Walker, Defendants.**

No. 91–Cr–5.

United States District Court, E.D. Wisconsin.

Dec. 21, 1992.

Paul Kanter, Asst. U.S. Atty., and Eric J. Klumb, Deputy U.S. Atty., Milwaukee, WI, for plaintiff.

Stephen Kravit, Kravit, Gass & Weber, S.C., Milwaukee, WI, for defendant Kurt Van Engel.

William E. Callahan, Davis & Kuelthau, S.C., Milwaukee, WI, for defendant Lyle Van Engel.

David P. Lowe, Jacquart & Lowe, S.C., Milwaukee, WI, for defendant Bernard Van Engel.

Thomas E. Brown, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for defendant Joseph Palmisano.

James M. Fergal, Schellinger & Doyle, Brookfield, WI, for defendant Barbara Schwellinger.

Steven M. Epstein, Levine, Epstein & Kohler, Milwaukee, WI, for defendant Howard Schaefer.

Kenneth Sullivan, Chicago, IL, for defendant Eugene Knoll.

Richard Kaiser, Waukesha, WI, for defendant Larry Pitzen.

Steven I. Cohen, Green Bay, WI, for defendant James Walker.

## DECISION AND ORDER

TERENCE T. EVANS, Chief Judge.

The final pretrial issue in this case is an unappetizing one; Kurt Van Engel's motion to dismiss the indictment based on a claim that the government engaged in prosecutorial misconduct and that it abused the grand jury process. The issue has been briefed, and a hearing was conducted on the matter at the end of October. After the hearing I urged the parties to meet and try to resolve the issue. I have been advised that efforts to reach an agreement were unsuccessful. My decision on the motion follows.

Mr. Van Engel asserts seven grounds in support of his motion to dismiss:

(1) the government prosecutor lied to the magistrate judge in order to keep a search warrant affidavit sealed between May and December 1988;

(2) government agents violated the secrecy provisions of rule 6(e);

(3) the prosecutor abused the grand jury subpoena power;

(4) the government presented an overabundance of hearsay;

(5) exculpatory evidence was kept from the grand jury;

(6) the grand jurors could not have understood the indictment; and

(7) the government pursued an unwarranted theory of the case that interfered with Mr. Van Engel's relationship with his lawyer, Stephen E. Kravit.

Issues three through six fall under the general claim of grand jury abuse. Issues one and two are hybrids; part grand jury abuse and part government misconduct. I will, in no particular order, address the first six issues and then go to the most troubling issue, number seven.

I will resist the temptation to get bogged down in a lengthy recitation of the facts giving rise to the various issues raised on this final motion to dismiss. The facts have been spelled out in other decisions, both by me and by the magistrate judge. They will not be repeated here. I will only comment on the facts if I believe that comment is necessary for a full understanding of the context within which I decide the issues.

Issue two relates to what I'll call the *Milwaukee Magazine* interviews. The lead agents involved in the investigation of Mr. Van Engel, Richard Arkenberg of the IRS and Peter Linder of the FBI, consented to be interviewed by James Romenesko of *Milwaukee Magazine* in early 1989, while the grand jury investigation was under way. It was not a good idea. In May 1989, *Milwaukee Magazine* ran a lengthy lead article entitled "The Battle of Commission Row" by Mr. Romenesko. It contained extensive, but unattributed, quotations that I find came from Agents Arkenberg and Linder. The article recounted, among other things, the allegations in various civil suits (the Baake, Zingale, and Shultz litigation), statements in the search

warrant affidavit, details of the execution of the search at the Van Engel company May 13, 1988, and gratuitous opinions and observations about the investigation of Mr. Van Engel. In his article, Mr. Romenesko ascribed much of his information and some of his quoted matter to "federal investigators" or "federal officials." Those agents were Arkenberg and Linder.

Federal government agents do not ordinarily talk to reporters about pending investigations. Agent Linder was reluctant to talk to Mr. Romenesko, but he was instructed to do so by his superior, Larry Nelson, the former agent in charge of this district's office of the FBI. Agent Arkenberg testified that in his 17 years as an IRS agent he had never given a statement other than "no comment" to the press about a pending case. The decision by the agents to talk to Mr. Romenesko was unusual.

Rule 6(e) states:

A grand juror, an interpreter, a stenographer and operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(i) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

 In a hearing before Magistrate Judge Bittner, Agents Arkenberg and Linder maintained that they talked with Mr. Romenesko only about information contained in the search warrant affidavit that had recently been made public. As I read it, the overwhelming percentage of information appearing in the *Milwaukee Magazine* story comes directly from the search warrant affidavit. Once information or evidence involved in a grand jury investigation properly becomes part of the public record, as it does when a search warrant affidavit is unsealed, it loses its character as grand jury material. Although it was unwise, the agents did not violate rule 6 by talking with Mr. Romenesko about the contents of the warrant.

 But, the agents' claim that they confined their discussion with the reporter only to matters disclosed in the search warrant affidavit is not credible. Agent Linder admitted to the possibility that he told Mr. Romenesko that "[t]his is the first time the FBI has looked into the produce business here." Agent Linder also admitted that he could have said "[w]e're all getting screwed on this." Agent Arkenberg, the affidavit's author, admitted saying that Mr. Van Engel "doesn't show his money at all." Both Agents Linder and Arkenberg discussed various "Oost" checks (claimed to be phony) with Mr. Romenesko, but maintained that they discussed only the Oost checks described in the affidavit and specifically did not discuss the Oost checks they had received from Mr. Van Engel's lawyers pursuant to a grand jury subpoena. Both agents said they might have made the statement that general knowledge in the banking industry is that company checks should not be cashed. These topics are beyond the contents of the search warrant. To the extent that they strayed—and they strayed a tad—from the four corners of the affidavit, they violated rule 6. But I am not convinced that the violation is the kind of knowing violation of the rule that would make sanctions appropriate.

Sanctions aside, the real problem with the highly unusual decision of the agents to speak with Mr. Romenesko about a pending investigation is that it adds fuel to Mr. Van Engel's argument that the government engaged in an orchestrated effort to try him in the press and ruin him personally, long before the return of the indictment. The agents let it be known that Mr. Van Engel was a bad guy who had done wrong. Comments like "We're all getting screwed on this" certainly convey the impression that the federal "investigators" or "officials" are convinced of Van Engel's guilt. These kinds of comments, to a reporter who is obviously going to use them in a story, should not be made. Agents should, absent a compelling need that is not present here, let indictments do their talking.

They should not, as agents of the government, give interviews and express opinions like those given here while a case or an investigation is pending. Had the *Milwaukee Magazine* article found its way into the grand jury room—which would not have been impossible—a resulting indictment would be suspect.

I now turn to issues one, three, four, and five. On these points, Mr. Van Engel complains about prosecution "lies" submitted to the magistrate judge, an alleged abuse of the grand jury's subpoena power, a "flagrantly excessive" parade of hearsay before the jury, and a failure, by the prosecutor, to present evidence to the grand jury that cast doubt on Mr. Van Engel's alleged criminality. These issues have at least one thing in common: not much merit.

■ Mr. Van Engel argues that the government abused the grand jury's subpoena power by subpoenaing individuals for the purpose of interviewing them instead of presenting them personally to the grand jury as witnesses. It appears that about 20 noncustodial witnesses received grand jury subpoenas during the time this matter was pending before a succession of three grand juries. Almost all of them gave statements to the government agents in lieu of testifying. Most of these witnesses were represented by counsel. The procedure followed seems to have been done with the knowledge and consent of the attorneys for the witnesses. Four witnesses who were not represented by counsel and who did not personally testify were from Florida, North Carolina, Texas, and Arizona.

The government, I believe, did not interview witnesses for any reason other than efficiency of the grand jury and the convenience of the witnesses and their attorneys. Most importantly, I find that Mr. Van Engel was not prejudiced by the procedure, and the grand jury was not misled or denied witnesses' testimony.

This leads to the next concern: the use, or rather the alleged "flagrantly excessive" use of hearsay in the grand jury room. Five witnesses (other than custodial witnesses) testified before the grand jury.

Three agents of the government—Linder, Arkenberg, and Mike Kohl of the Department of Labor—testified before the indicting grand jury. Two minor witnesses testified before the first grand jury. Arguing that because no "transactional" witnesses were called to testify, Mr. Van Engel says that the indictment is based on an excessive amount of hearsay.

■ Mr. Van Engel, citing *United States v. Flomenhoft*, 714 F.2d 708, 712 (7th Cir. 1983), *cert. denied*, 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984), argues that the "excessive use of hearsay evidence in a grand jury proceeding violates an accused's Fifth Amendment rights." That's not exactly what *Flomenhoft* says. Rather, it notes the long-settled law that hearsay is not only admissible before a grand jury, but that "an indictment based solely on hearsay evidence is valid." *Flomenhoft* only helps the defense when it goes on to note that the "excessive use of hearsay evidence in a grand jury proceeding *may* violate" a defendant's rights. 714 F.2d at 712 (emphasis added). So one must look for an egregious situation before too much hearsay spoils an indictment. *Flomenhoft* was not such a case, and neither is this one. The claim that the prosecutor here somehow browbeat or intimidated the grand jury into refusing to pursue the attendance of witnesses is unpersuasive.

■ Mr. Van Engel also argues that exculpatory evidence was not presented to the grand jury. Most of the air has been taken out of this issue by the Supreme Court's recent decision in *United States v. Williams*, —— U.S. ——, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). In a nutshell, *Williams* held that a district court may not dismiss an otherwise valid indictment because the government failed to disclose to a grand jury "substantial exculpatory evidence in its possession." *Williams* controls this issue, which must be resolved against Mr. Van Engel.

Lastly on this series of issues is Mr. Van Engel's claim that lies were offered by the prosecutor to the magistrate judge. The government filed three motions with the

magistrate judge seeking orders to continue the sealed status of the search warrant affidavit. Mr. Van Engel contends that the prosecutor "made false and misleading statements" in these motions in an effort to secure an order keeping the search warrant affidavit under wraps. The magistrate judge granted the extension—although for shorter periods than requested—and the search warrant affidavit remained sealed until December of 1988, 8 months after the search was conducted.

I do not find that lies were submitted by the prosecutor to the magistrate judge to secure extensions of the sealing orders. I also do not believe that the government had an obligation, during the period in question (post-search warrant execution through the last sealing motion), to tell the magistrate judge that the government was investigating Mr. Van Engel's attorney. As conceded by the government at the October hearing, the third sealing motion did contain an inaccurate paragraph that, consistent with the deletion of another paragraph, should no longer have been in the motion. But, I believe that this was a mistake, not an intentional falsehood. When one reviews the whole record, including the sealed exhibit D, which describes a serious incident involving Mr. Van Engel, one cannot help but conclude that there's not enough heat on the issue to start a fire. This issue is resolved against Mr. Van Engel.

That's all that needs to be said about issues one, three, four, and five. Although I have found no merit to Mr. Van Engel's complaints on these four issues, that should not be interpreted as a signal by me that I think the government did everything correctly. It did not. The comments of AUSA Paul Kanter to the grand jury that he did not want to "parade before you 200 people" could be viewed as a veiled attempt to discourage the grand jury from insisting on hearing the testimony of live witnesses. I don't subscribe evil motives to the statement, but it was not a good way for him to address the situation. Also, Mr. Kanter was, on occasion, too cavalier with the grand jury. For example, he commenced a discussion with the grand jury about the law by saying:

> Federal law, in order to be a federal crime and to have a crime prosecuted in federal court as opposed to state court, there has to be what is kind of a stupid word, but you know lawyers; they have to come up with stupid words to make themselves look important. And since Congress, of course, is made of primarily lawyers, all our laws are written stupidly, and no one can understand them but lawyers, and that keeps lawyers employed.

Comments like these are not what one expects from an experienced government attorney. Lastly, at least the third, and possibly the second, request to the magistrate judge for extensions of the sealing order do not appear to have been fully justified. The fact that I am willing to give the benefit of the doubt on this point to the government does not mean that I do so without reservations. I move now to issue six, Mr. Van Engel's claim that the grand jurors could not have understood the indictment before it was signed and returned.

The ultimate product of a grand jury is an indictment. The 82–page indictment returned by the grand jury in this case named 10 defendants and covered 95 counts.[1] It contained allegations of three different conspiracies and schemes to defraud.

The indictment handed up by the grand jury was presented to it for consideration on January 3, 1991. The government has stipulated that it was read to the indicting grand jury on January 3 prior to the grand jury being asked to consider it. All exhibits, subpoenaed material, and transcripts of testimony heard by other grand juries that considered the case were left with the indicting grand jury during its deliberations on January 3.

---

**1.** Ironically, attorney Kravit is no stranger to multicount monster indictments. As an assistant United States attorney in this district in the 1970's, he got a grand jury to return an indictment against the Jos. Schlitz Brewing Company that contained 652 more counts than appear in the indictment returned in this case.

I do not know how long it took the prosecutor to read the 82–page proposed indictment to the grand jurors. But I suspect that even Evelyn Wood would have needed a few hours. And, considering its complexity, it is difficult to fathom how the grand jurors could have fully understood its contents. So I have concerns about what happened here. To put those concerns in context, a brief review of the grand jury as an institution is appropriate.

The grand jury plays a unique roll in the federal criminal process. But just what that role is is not altogether clear. Flowery Supreme Court decisions describe the grand jury as a bulwark of freedom; an independent group of citizens that stands between the all-powerful government and the powerless citizen. The purpose of the grand jury is "to provide a fair method of instituting criminal proceedings...." *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Its "mission is to clear the innocent, no less than to bring to trial those who may be guilty." *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–773, 35 L.Ed.2d 67 (1973). The grand jury is "a protector of citizens against arbitrary and oppressive governmental action." *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). It is often said, therefore, that a grand jury must be both "independent" and "informed." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). As Chief Justice Warren noted in *Wood:*

> Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.... The necessity to society of an independent and informed grand jury becomes readily apparent....

People who are intimately involved with the day-to-day operations of grand juries often scoff at the kind of lofty descriptions announced by Chief Justice Warren in *Wood.* It is the view of many that grand juries today are nothing more than tools of the prosecution. As the late William J. Campbell, a distinguished former chief district court judge from Chicago, noted:

> Today, the grand jury is the total captive of the prosecutor who, if he is candid, will concede that he can indict anybody, at any time, for almost anything, before any grand jury.

Judge William J. Campbell, *Eliminate the Grand Jury*, 64 Journal of Criminal Law and Criminology 174 (1973). What happened in this case shows, I believe, that Judge Campbell was on to something when he spoke of the grand jury as a sword rather than a shield.

Given what occurred in this case, one certainly has to question the quality and the quantity of consideration given to the proposed indictment before the jurors knocked on the door to say their deliberations were finished. The process that was followed casts doubt on whether the grand jury performed as a protective bulwark between the government and the ten indictees in this case.

But unfortunately for Mr. Van Engel, that doubt is not a sufficient basis for dismissing the indictment. Despite my misgivings about the process in general and the procedure used in this case in particular, the law does not make dismissal of the indictment on the basis of this claim a reasonable option.

■ An indictment returned by a legally constituted grand jury is presumed to be valid on its face. Similarly, there is a strong presumption of regularity that attaches to all grand jury proceedings. A defendant seeking to challenge this presumption has a difficult burden. *See Costello, infra; United States v. Lisinski*, 728 F.2d 887, 893 (7th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984); *United States v. Battista*, 646 F.2d 237, 242 (6th Cir.), *cert. denied*, 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981).

Mr. Van Engel relies on *United States v. Carcaise*, 442 F.Supp. 1209 (M.D.Fla.1978), a district court decision dismissing an indictment because a grand jury did not have sufficient time to give it proper consideration. The court in *Carcaise* concluded that the grand jury could not have "read and understood the 1,160 pages of deposition testimony in a session of 6 hours and 45 minutes, a part of which was occupied by other matters." 442 F.Supp. at 1213. A similar conclusion is not justified in this case.

■ Unlike *Carcaise*, the grand jury in this case was not asked to review 1,160 pages of transcripts of prior testimony, hear the testimony of 12 witnesses, and deliberate on the proposed indictment in less than 7 hours. The indicting grand jury here met four times, hearing live (albeit mostly hearsay) testimony on three of the occasions. Prior testimony, with one minor exception, was read to the grand jury. The indictment was read to the grand jury in its entirety and left for its review, along with all other evidence, during its deliberations. The grand jury was free to consider the matter for as long as it wished.

True, the grand jury acted rather quickly in this case. But a quick indictment, like a quick verdict returned by a petit jury, can be just as indicative of a strong case as it can be of juror indifference or confusion. For this reason alone, it is unwise to look with suspicion at an indictment or a verdict returned after a short period of deliberation.

*Carcaise*, where the indictment was dismissed without prejudice so the matter could be reconsidered by another grand jury, was an extraordinary case. This case is merely unusual. Given the law as it exists, I decline to find fault with the grand jury's deliberations in this case.

So I leave the issues regarding the grand jury with an overall view that the process, although singed a bit, was not burned. The violation of rule 6 was a misdemeanor. The shortcomings I noted were unfortu-

nate. But to dismiss the indictment based on these claims would be wrong. I turn now to the last issue.

On the previous issues I was content to not fully lay out the facts because they were set forth in other decisions. On the final issue, I think it best that the facts as I see them be stated.

In May of 1987, Gerald Baake and Anthony Zingale, alleged part owners in Kurt Van Engel's produce business, filed separate civil RICO lawsuits in federal court alleging the same facts: Kurt Van Engel skimmed money from his own company by issuing phony checks made out to "Jake Oost"; Van Engel submitted an inflated insurance claim to Aetna Casualty & Surety Company, claiming he lost produce he never had when an explosion during the construction of Milwaukee's deep tunnel project rocked his company; and, generally, Van Engel swindled both Baake and Zingale out of their rightful shares in Van Engel's business. Mr. Van Engel hired attorney Stephen E. Kravit to represent him in the defense of the two civil RICO cases. Mr. Kravit filed motions to dismiss the complaints on July 7, 1987.

Mr. Kravit's motions to dismiss apparently were good ones because Baake and Zingale voluntarily dismissed their complaints under Fed.R.Civ.P. 41 on August 14, 1987. At some point, Baake's lawyer, Clifford Steele, told Mr. Kravit that he had conveyed Baake's allegations to the government—specifically to Assistant United States Attorney Eric Klumb. Kravit and Klumb knew each other. Klumb worked for Kravit as a law clerk when Kravit was an assistant U.S. attorney and, when Klumb became a lawyer, he worked at Kravit's former firm, Godfrey & Kahn, for 8 months. While in the United States Attorney's office on another matter on August 17, 1987,[2] Kravit talked with Klumb about the Baake matter. AUSA Klumb told Kravit that the government had not opened a case regarding Mr. Van Engel and had not assigned an agent to investi-

---

**2.** Kravit's records show that this conversation occurred on August 17. Klumb, understand-

ably, has no record of the date as it was just a conversation in passing between two friends.

gate the allegations in the civil RICO suits. Mr. Kravit ended his conversation with Klumb with the understanding that there was no government investigation pending or presently contemplated.

In the early fall of 1987, through their lawyers, both Baake and Zingale threatened to re-file the civil RICO complaints that had been dismissed. During September, Mr. Kravit negotiated with Baake's lawyers for the settlement of Baake's potential claim. A settlement agreement, finalized on October 7, 1987, called for the payment to Baake of $450,000 in exchange for his shares (one-third ownership) in Palmisano & Baake, Inc. Among other provisions, Baake agreed not to compete in the produce business in consideration for $1,500 paid monthly for 2 years. Baake agreed to give Mr. Van Engel his lawyer's litigation files and certain tape recordings he had made of conversations with Mr. Van Engel. Baake also agreed to notify Mr. Van Engel or Mr. Kravit if government agents or others contacted him about the matters described in his previous lawsuit. The agreement, labeled as "confidential," did not constrain Baake from speaking to the government nor dictate what Baake could say:

> This contractual obligation to inform Van Engel or his attorney of such contacts should not be construed in any way as prohibiting Baake from receiving such contacts or as telling Baake what he may say pursuant to such contacts.

A similar settlement agreement was being negotiated with Mr. Zingale.

In late November 1987, Timothy Girdaukas, a produce buyer for Shultz Sav-O stores in Sheboygan, lost his job, allegedly because he had been bribed by Mr. Van Engel. Shultz's lawyer contacted the United States Attorney's office with the information. A short time later, Mr. Girdaukas began to cooperate with the government by recording conversations over the telephone and in person with Kurt Van Engel in December 1987. These conversations became the basis for count 78 of the indictment, obstruction of justice.

In January 1988, grand jury consideration of the case commenced under the primary direction of AUSA Paul Kanter. Mr. Baake was interviewed by government agents Arkenberg and Linder on March 23, 1988. According to Arkenberg's memorandum (but, strangely, not Linder's), Baake claimed that, during the discussions of the settlement of Baake's civil RICO case, Mr. Kravit "advised" Baake that he "wanted all of the documents and tape recordings Baake had made in respect to Van Engel so they could be destroyed." Baake's statement to the agents, and the Baake–Zingale–Van Engel settlement papers, prompted the prosecutors to widen the probe of Mr. Van Engel to include an investigation into the conduct of attorney Kravit.

Some time prior to May 13, 1988, agent Arkenberg prepared an affidavit (the same one that was kept sealed at Mr. Kanter's request until December of 1988) to support an application for a warrant to search the buildings where Mr. Van Engel did business. The warrant was executed on May 13, 1988. After the search started, Mr. Van Engel, or someone at his request, called Mr. Kravit at his office to tell him that the warrant was being executed. Soon after the call, Kravit arrived to observe the search.

During the search, Mr. Kravit objected to the seizure of various items that he said were protected by the attorney-client privilege. When he complained, an agent escorted him out of the room being searched and tried to force him to leave the premises, claiming he was obstructing the search. AUSA Kanter was contacted by phone about the situation, and he told the agent that Kravit could remain on the premises. Kravit was appropriately told, however, that the seizure of the documents would continue without interference. Not unexpectedly, documents that Kravit claimed were privileged were seized. I later agreed with Mr. Kravit that certain materials seized from Mr. Van Engel's office were "quite possibly subject to attorney-client privilege" and that a determination would have to be made at a later point if the government attempted to use them in evidence at trial (decision of February 6,

1992, at 31). Thousands of documents were ultimately seized and carted away from Mr. Van Engel's business after the search.

Later on the same day of the search, at the government's behest, Mr. Baake telephoned Mr. Kravit at his office, ostensibly to report a government contact pursuant to the civil settlement agreement. The call was taped. Baake told Kravit that he had received a subpoena to testify about Mr. Van Engel before the grand jury. During the conversation, at Mr. Kanter's or the agents' request, Baake clearly attempted to get Kravit to obstruct Baake's testimony. Kravit did nothing of the sort. He simply asked Baake for the "matter" number of the subpoena, and he told Baake he should contact a lawyer.

After the May 13 telephone conversation, and continuing through July of 1988, at the government's request, Baake initiated other taped telephone calls and meetings with Kravit or his investigator in an attempt to discover or create incriminating statements to ensnarl Kravit in criminal activities.

In the summer of 1989, more than a year after the investigation of him started, Mr. Kravit finally learned that he personally was the subject of a continuing government undercover investigation into his conduct while representing Mr. Van Engel. This information was not conveyed to him by the government, but by a lawyer for attorney Steele, who at the time was Mr. Zingale's lawyer. This caused Van Engel, upon Kravit's advice, to immediately retain separate counsel unassociated with the Kravit firm. Mr. Kravit also retained an attorney. In December 1989, 20 months after it commenced its investigation of Mr. Kravit, the United States Attorney's office for this district recused itself and sent the file to the United States Attorney's office for the Northern District of Illinois. The case was assigned to Assistant United States Attorneys Michael Shepard and Joel Bertocchi.

In May 1990, AUSAs Shepard and Bertocchi closed the investigation of Kravit by declining to prosecute him for criminal misconduct. Oversight of the Van Engel case was then returned to the United States Attorney's office in this district.

■ I start my analysis of this issue by noting what should be obvious: the decision to formally investigate the conduct of an attorney representing a defendant who is under investigation or under indictment is a serious matter. Such an investigation has the potential for playing havoc with the constitutional right to be represented by a lawyer. I was surprised to learn during the October hearing that the decision on whether or not to launch an investigation of this sort is pretty much up to the judgment of the assistant United States attorney handling the case. No formal rules, procedures, or guidelines are in place to govern such an investigation. Considering the seriousness of and possible consequences attending such a decision and the obvious problems it can cause for the case in general and the attorney involved in particular, I find the lack of standards, procedures, and guidelines to be shocking.

As best I can determine, the government decided to investigate the conduct of Mr. Kravit for two reasons: It had received the statement from Baake that Kravit wanted to "destroy" evidence, and it had a copy of the written settlement agreements in the Baake–Zingale lawsuits which required, as a condition of the settlement, that all "litigation files" (and in the Zingale matter, tape recordings) be turned over to Kravit as Mr. Van Engel's attorney.

I find that, given this state of affairs, the government was justified in coming to the conclusion that it should "look into the matter." Some type of inquiry, probably an informal one, was appropriate. But I do not believe that the launching of a full-scale undercover investigation of attorney Kravit was justified based on what the government knew at the time. What was done in this case far exceeded what should have been necessary to see that no laws were being broken. To put into context why I think that what the government did here was wrong, it is helpful to note what I believe would have been an appropriate governmental response given the information that was available.

Given the fact that the government attorneys in charge of the investigation had no significant experience in the handling of civil RICO lawsuits, it would have been advisable for them to show the written settlement agreements to more experienced attorneys—in or out of their office—and solicit opinions as to whether the agreements contained anything that was illegal. I don't believe that any competent attorney handling civil RICO litigation would have concluded that the turnover provisions of the settlement agreements were inappropriate. At the most, the turnover provisions might have been construed as "aggressive lawyering," but they would not have been found to be illegal. The fact that the prosecutors did not seek advice from anyone with civil RICO expertise is a major flaw in the way the United States Attorney's office handled this investigation.

In addition to the settlement agreement itself, the government had the statement of Baake, given to Agent Arkenberg (as I previously noted, Agent Linder was present at the time but doesn't have a note of the statement in his form 302 report), wherein Baake said that Kravit told him he wanted to get the evidence so that it could be destroyed. Rather than inquire as to whether or not this statement had any reasonable chance of being true, the government apparently accepted it as true, or probably true, and used it as one of the two cornerstones of its investigation of attorney Kravit. An appropriate inquiry in my view would have been to ascertain the context within which that statement was allegedly made. That inquiry would have disclosed that Kravit did not have conversations with Baake when others, including attorneys for Baake, were not present. That a statement such as this would have been made by an attorney, especially with witnesses to it, is most unlikely.

So I believe the government was justified in making an inquiry, and had it made the kind of inquiry I am suggesting here, the matter would have quickly died. Instead, the government saw criminality where none was present and embarked on an investigation that created a 2–year nightmare for attorney Kravit and a major problem for Mr. Van Engel.

It is true, of course, that no one is above the law, including an attorney. If an attorney commits criminal acts he or she should, of course, be investigated and prosecuted. But it is not unreasonable to expect that good judgment and common sense will be brought to bear on the nature and extent of an investigation of anyone accused of wrongdoing, including an attorney.

The attorney subject to the investigation, Stephen Kravit, is a former assistant United States attorney in this district. He had a distinguished career as a lawyer in that office, and he enjoys a stellar reputation in the Milwaukee legal community. It would not have been inappropriate for the government to take this into account in considering whether or not it was likely that Mr. Kravit had violated the law, as alleged by Mr. Baake and suspected, apparently, by the government when it reviewed the written settlement agreements. If someone came into the United States Attorney's office with an allegation that Zdenek Macal, Rembert Weakland, and Bud Selig were involved in a conspiracy to import multikilograms of cocaine from Colombia, one would think that their reputations would give pause to a government attorney receiving the tip. Even in this bizarre situation an "inquiry" might be appropriate; the launching of a full-scale undercover investigation would be outrageous.

Instead of conducting the more modest and prudent inquiry I have suggested, the government launched into a sting investigation of Mr. Kravit. Mr. Baake was given a phony subpoena allegedly ordering him to appear before the grand jury and produce documents. Baake, at the government's direction, then called Mr. Kravit at his law office. The call was made after Kravit returned to his office following the search earlier in the day at the Kurt Van Engel company. During the taped conversation Baake was attempting to get Kravit to tell him what to do or what to say in regard to the subpoena. He was trying to get Kravit to obstruct justice. Mr. Kravit didn't even come close to taking the bait

and instead made only appropriate inquiries of Mr. Baake. Although I think it was going too far to send Mr. Baake out on this fishing expedition, I think that once it was completed, and no fish was caught, that the "investigation" should have come to an end. But it did not. There were many more surreptitiously taped telephone conversations and face-to-face meetings as Baake continued to pursue Kravit. All during this time, Kravit did not come close to engaging in illegal activity.

One unsettling example of the way the government conducted the Kravit investigation arises from a comparison of the government's transcript to the actual tape of one of the recordings Baake made when acting as the government's undercover agent. In a discussion about Baake making statements to the government, Mr. Kravit says the following:

> Right. And nobody ever said you shouldn't tell the truth.

But the government's transcript of this taped statement has Mr. Kravit saying:

> Alright, nobody ever said you should go.

If Mr. Kravit said to Baake, "Nobody ever said you should go," a reasonable inference might be that he was suggesting that Baake need not respond to a government subpoena. In fact, of course, Mr. Kravit's real statement permits no such inference. The opposite is true: he told Baake to tell the truth. The government explains the error by saying that the transcription here was just a "draft." But draft or not, more should be expected from the government in a sensitive investigation of this sort.

As shaky as the factual foundation for this investigation and sting operation was, its legal foundation was even weaker. There are no criminal charges that could stem from what the government thought Mr. Kravit did. The Baake settlement provisions could not constitute obstruction of justice as contemplated by 18 U.S.C. § 1510, since the government had no basis for showing the existence of, or Mr. Kravit's knowledge of, a pending investigation. *United States v. Carzoli*, 447 F.2d 774 (7th Cir.1971), *cert. denied*, 404 U.S. 1015, 92 S.Ct. 673, 30 L.Ed.2d 662 (1972). The government was aware that AUSA Klumb had told Kravit there was no investigation, and Kravit's obvious good-faith reliance on Klumb's statement would negate the specific intent required by the statute. *United States v. Carleo*, 576 F.2d 846, 849 (10th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978); *see United States v. Machi*, 811 F.2d 991 (7th Cir. 1987); *United States v. McComb*, 744 F.2d 555 (7th Cir.1984). Mr. Kravit neither committed any affirmative act, nor failed to perform an act required to be done, sufficient to impose criminal liability under section 1510. Prosecution under a theory of conspiracy to defraud the government, in violation of 18 U.S.C. § 371, would also have been untenable, since the settling of the Baake case was not a fraudulent act and did not compromise the integrity of any governmental investigation. *See Hammerschmidt v. United States*, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924); *United States v. Minarik*, 875 F.2d 1186 (6th Cir.1989). There is no "crime" that could have been based on the facts in the government's possession. Its investigation stemming from Baake's incredible statement was based on legal theories that were nonexistent.

Mr. Kravit's counsel provided Assistant United States Attorneys Shepard and Bertocchi with the written opinions of Notre Dame Law School Professor G. Robert Blakey (the father of the federal RICO statute), Professor Michael McChrystal of Marquette Law School, and Indiana University Law School Dean Norman Lefstein. All are experts on RICO law, obstruction of justice statutes, and/or legal ethics. The three experts discussed the Baake–Zingale–Van Engel settlement agreements in light of RICO, obstruction of justice statutes, and codes of professional attorney responsibility.

Professor Blakey noted in his opinion letter that

> [s]ettlements, not only of RICO claims, but also of anti-trust and securities matters always involve the settlement of issues that raise at least a possibility of a parallel criminal prosecution. Confiden-

tially [sic] agreements, too, are not unique. In fact, they are a common feature of the settlement of civil litigation generally.... An effort to use the blunt instrument of the criminal law to second guess good faith civil negotiations in the RICO—or any other area—would be, not only unauthorized and unprecedented, but also profoundly unwise.

....

A prosecution on this set of facts of this individual would be a travesty of justice.

In concluding that attorney Kravit violated no ethical provisions of the code of professional responsibility, Professor McChrystal noted:

If lawyers were bound to evaluate all material they receive as to whether it could constitute evidence of a crime and so had to be revealed or produced, the principle of confidentiality would be lost. The mere potential that materials received by the lawyer could be evidence of a crime is far too loose a standard upon which to impose a duty to reveal or produce the material, and no reasonable construction of the Code would support such a standard.

Dean Lefstein said:

It is my opinion that Mr. Kravit's conduct in negotiating and in preparing the agreement was not improper and does not subject him to charges of professional impropriety under either Wisconsin rules or the American Bar Association Standards for Criminal Justice Relating to The Defense Function.

The full opinion letter reports of Blakey, McChrystal, and Lefstein are attached to this decision and incorporated herein. Read together, their opinions say that Mr. Kravit not only did nothing wrong in his handling of the Baake–Zingale civil RICO settlements, but that he was doing what his duty required in negotiating the terms of the agreements including the requirement that litigation files and tapes be turned over. Had the government prosecutors, as I suggested, run the settlement agreements past someone with more experience early on, they would have been told

the same thing. But caution was not exercised by the government. Flying blind, the ill-fated undercover investigation of attorney Kravit was launched. It was to last for over 2 years.

During the hearing on this matter in October, Mr. Kravit, I believe, hit the nail on the head when he said the government really approached its investigation of him as it would approach the investigation of a drug case. There is a big difference, however, between the two. In fraud litigation, both civil and criminal, what happens can be interpreted in different ways because there is no contraband, like a kilo of cocaine, that taints everyone who touches it. In fraud litigation you have to look for duties, and you have to look for shades of gray as to how the duties might have been exercised. I do not think that was done here by the government. The government, it seems to me, looked at this situation and thought that everything about it was probably criminal.

The government seems to view the civil fraud lawyer today as almost a policeman or agent of the government. The government seems to suggest that, when a lawyer handling a civil case comes upon a situation that has lots of different potentialities, the lawyer must first and foremost be thinking about how it is he or she should report the activity to the government. The lawyer should be thinking about how the evidence is to be preserved so that the government can find it later on in its investigation. That is not what the law requires. Telling on this point, which underscores the view that the government approached this case like a drug investigation, was its attorney's argument during the October hearing that it had a right to investigate Kravit just as it investigated and uncovered wrongdoing in the case of attorney Marc Polland. Mr. Polland was an attorney who was successfully prosecuted recently for distributing cocaine, which he obtained from a client. There are no gray areas regarding cocaine. That kind of a situation is cut and dry. A lot more consideration, sifting, and winnowing of responsibilities, duties, and obligations in the gray area of civil and crimi-

nal fraud is necessary to make a case. This was a distinction that, it seems to me, was given far too little attention by the government.

From start to finish, the investigation of Mr. Kravit lasted more than 2 years. The length of the "investigation" boggles the mind. Mr. Kravit has been wronged by this activity. One can only imagine the anxious moments and sleepless nights he endured by unnecessarily being the subject of a federal criminal undercover investigation. The awesome power to inflict that kind of pain on a citizen should have been exercised with greater controls and supervision than occurred here.

While I have no real difficulty reaching the conclusions I have reached regarding the Kravit investigation, those conclusions take me to the next step, which creates a few more problems. If Mr. Van Engel was not harmed by the investigation of Mr. Kravit it would be, in the playground vernacular, no harm no foul. Under the unique facts of this case, however, I find that Mr. Van Engel was prejudiced by the investigation of his attorney. The government's investigation interfered with Mr. Van Engel's relationship with his lawyer. The investigation has forced Mr. Kravit to become a potential defense witness.

Also, while the investigation of Kravit was underway, Mr. Van Engel's right to counsel guaranteed by the sixth amendment was damaged. During the undercover sting operation, Mr. Kravit had 48 contacts with the prosecutors in this case. Because he was under investigation, the prosecutors, although professing to treat him just like they would any other attorney, refused to have substantive discussions with him about the case.

While Mr. Van Engel certainly did not enjoy any right to have an early disposition of this case through plea negotiations, that was an option that would have ordinarily been available to him but for the investigation of Mr. Kravit. Mr. Kravit did say that he tried to engage in early plea negotiations in this case but that the government refused to consider it. At the time, he didn't know why, and the reason was, of course, the undercover investigation of him. Because the government suspected criminality, it did not give true credibility and respect to Kravit's position as Van Engel's advocate.

Van Engel also had to hire another lawyer at additional expense to represent his interests independent of Mr. Kravit after the undercover operation was disclosed. Also, it is obvious that the lengthy investigation of Kravit greatly increased the time that this case was in the pre-indictment stage. While no defendant enjoys a constitutionally protected right to a speedy indictment, 3½ years of preindictment investigation is a long time. It is certain here that Mr. Van Engel would have been indicted earlier and had his case resolved one way or the other sooner if the investigation of Kravit had not taken place. The investigation of Kravit has also made the post-indictment proceedings longer and much more expensive for Mr. Van Engel.

In summary, I conclude that Mr. Van Engel has been prejudiced by the actions of the government in investigating his attorney in this case. But even given this finding, what Mr. Van Engel asks for as a remedy is out of bounds. He wants the indictment dismissed. In my view, that would be too great a penalty to impose on the government for what I have concluded it has done wrong. A remedy short of dismissal, however, is appropriate.

In fashioning a remedy for Mr. Van Engel, I return to the indictment. In my decision of February 6, 1992, I called it "bloated." Having returned to it again in this decision, I have concluded that I was too kind in my description of it back in February. It is awful. It is one of the most poorly drafted charging documents I have ever seen.

The indictment has lost 56 of the 89 counts against Mr. Van Engel via my decision of February 6. Most of those counts were dismissed because the charges were stale—outside the applicable statute of limitations. In other respects, the indictment barely survived defense motions to dismiss for duplicity and multiplicity. Even with the dismissal of 56 counts, Mr. Van Engel

faces an unbelievable smorgasbord of charges in what's left of this indictment. At this time he remains charged with:

1. Conspiracy (over 6 years) to defraud two insurance companies (Aetna and Granite State) by submitting false claims of loss. Count 57.

2. Six substantive counts of mail fraud regarding the alleged insurance company swindle. Counts 30 through 34 and count 56.

3. Conspiracy (over 4 years) to defraud various grocery chains (Shultz Sav–O Stores, Inc. and Roundy's Inc.) by means of false representations. Count 66.

4. Four substantive counts of mail fraud regarding the conspiracy involving Shultz Sav–O stores. Counts 59 through 62.

5. One substantive count of mail fraud regarding the conspiracy involving Roundy's. Count 64.

6. Three counts of structuring financial transactions to evade IRS reporting requirements. Counts 75, 76, and 77.

7. Obstruction of justice. Count 78.

8. RICO. Count 79.

9. Ten counts of filing false individual and corporate tax returns. Counts 80 through 86, 88, 90, 92, and 94.

10. Conspiracy (over 7 years) to defraud the United States in the collection of taxes. Count 95.

Even Al Capone[3] didn't face such a broad range of charges. If this were a football game, the government would be penalized 15 yards for piling on.

Noting the violation I have found of Mr. Van Engel's sixth amendment rights, but rejecting his claim that all counts in the indictment should be dismissed, I am led to what I think is an appropriate remedy under the unique circumstances of this case. The indictment will be pruned. A partial dismissal of the indictment as to Mr. Van Engel will be ordered. As a remedy for the violation I have found, I ORDER that the following charges against Mr. Van Engel be dismissed:

1. The RICO count, number 79.

2. The 10 substantive tax counts, 80 through 86, plus 88, 90, 92, and 94.

3. The tax conspiracy count, number 95.

These counts have been selected for dismissal for several reasons. The RICO count is the most cumbersome and most time-consuming one to present, and for that matter to defend. Excising it from the indictment will save trial time and expense for Mr. Van Engel. Also, dismissing the RICO count has an element of sanction to it that is appropriate in this case. The tax counts, given what else is left of the indictment, do not have to be litigated in a criminal forum. A civil tax suit can be commenced by the government if it believes the tax laws have been violated.

This turn of events prompts me to revisit the order of trial and severance-joinder discussion I noted in my decision of October 7, 1992. When I last left this issue, three trials were ordered. That part of the order of October 7, is VACATED. The new order of trial will be:

**Trial #1**

Conspiracy to defraud Shultz/Roundy's, count 66; substantive counts re Shultz/Roundy's, counts 59, 60, 61, 62, and 64; obstruction of justice, count 78. The defendants in this trial will be Kurt Van Engel, Joseph Palmisano, Bernard Van Engel, Barbara Schwellinger, Howard Schaefer, and Eugene Knoll.

**Trial #2**

Conspiracy to defraud Aetna and the Granite State Insurance Company, count 57; substantive counts re Aetna/Granite, counts 30 to 36 and count 56. Defendants in this trial will be Kurt Van Engel, Lyle Van Engel, Larry Pitzen, and James Walker.

If anyone is interested in more trials after these two are completed, the remaining counts will be tried in this order:

---

3. I feel comfortable using Capone's name here only because Mr. Kanter used it, as part of an analogy, before the grand jury on December 6, 1990.

**Trial # 3**

Structuring financial transactions, counts 75, 76, and 77 as regards Kurt and Bernard Van Engel.

**Trial # 4**

Substantive income tax counts, numbers 87, 89, 91, and 93 against Mr. Palmisano, and tax conspiracy, count 95, against Mr. Palmisano, Mr. Schaefer, and Bernard Van Engel.

The attorneys in trial # 1 should appear in court for a scheduling conference on Friday, January 8, 1993, at noon. The defendants need not appear. A trial date for the second trial will·be set after the first trial is finished.

SO ORDERED.

## APPENDIX

Att. 13

Notre Dame Law School

Notre Dame, Indiana 46556

Direct Dial Number

219–239–5717

October 30, 1989

RECEIVED

OCT 31 1989

BUKEY & BENTLEY

8:40

Mr. David B. Bukey

Bukey & Bentley

1111 Third Ave, Suite 1060

Seattle, WA 98101

Re: *Stephen E. Kravit*

Dear Mr. Bukey:

This will acknowledge your letter of October 6, 1989, in which you requested me to evaluate, from a prosecutive standpoint, certain materials in light of 18 U.S.C. § 1510.

My conclusion is that these materials do not present even a colorable violation of 18 U.S.C. § 1510.

### I. *Personal Background*

Currently, I am a professor of law here at the Notre Dame Law School, where my subjects include Criminal Justice and Federal Criminal Law. Previously, I was a special attorney in the Department of Justice from 1960 through 1964; chief counsel of the Senate Subcommittee on Criminal Laws and Procedures, chaired by Senator John L. McClellan, from 1969 through 1973; special counsel to the minority on the Senate Judiciary Committee, ranking member, Senator Joseph Biden, from 1985 to 1986; and special counsel to House Judiciary Committee, chaired by Congressman Peter Rodino, during 1988.

While I was chief counsel to the Senate Subcommittee on Criminal Laws and Procedures, I drafted, at the Subcommittee's direction, the Organized Crime Control Act of 1970, Title IX of which is known as the Racketeer Influence and Corrupt Organizations Act (RICO). Since 1970, I have lectured on RICO in judicial, prosecutive, and plaintiff and defendant contexts. I have also written on the statute. I have also drafted or assisted in the drafting of more than half of the present 29 state RICO statutes. Finally, I have consulted or personally handled criminal and civil litigation under the federal and state statutes, participating, from a plaintiff's and a defendant's perspective, in numerous civil RICO settlements.

While I was a special counsel to the Senate Judiciary Committee in 1985 and 1986 and to the House Judiciary Committee in 1988, my responsibilities included working on hearings and legislative proposals that touched all aspects of criminal and civil litigation under RICO.

### II. *Materials Received*

I have carefully reviewed the following documents:

1. the search warrant affidavit of May 13, 1988, which attaches a copy of the Baake/Van Engel October 1987 settlement agreement;

2. exchanges of correspondence leading up to and following the Baake/Van Engel agreement;

3. a copy of a letter of intent written by Mr. Kravit to counsel for Mr. Zingale, after the time of the Van Engel/Baake settlement; and

4. a copy of the civil action in *Baake v. Van Engel.*

### III. *Conclusion*

My conclusion is that these materials do not present even a colorable violation of 18 U.S.C. § 1510, which, in relevant part, provides:

Whoever willfully endeavors by means of bribery to obstruct ... the communication of information relating to ... any criminal statute ... to a criminal investigator shall be fined ... or imprisoned. ...

The relevant jurisprudence under Section 1510 may be quickly summarized. Belief that a witness "might give information to federal officials" is sufficient for a violation. *United States v. Leisure,* 844 F.2d 1347, 1364 (8th Cir.1988) (murder of possible witness obstruction under former version of § 1510), *cert. denied,* 109 S.Ct. 403 (1988). Actual obstruction is not required, since the statute proscribes "endeavors," *United States v. Murray,* 751 F.2d 1528, 1534 (9th Cir.1985), *cert. denied,* 474 U.S. 979 (1986), a concept less stringent than attempt. *United States v. Leisure,* 844 F.2d at 1366–67. Arguably, the statute requires actual bribes, not merely an endeavor to bribe. *See United States v. Stafford,* 831 F.2d 1479, 1483–84 (9th Cir.1987). The matter is of little moment, however, since "willful conduct" is required on either constructure, and "willfully" means "deliberately with knowledge" or "specific intent." *United States v. Leisure,* 844 F.2d at 1366 (citing *United States v. Mekjian,* 505 F.2d 1320, 1324 (5th Cir.1985) and *United States v. Sirhan,* 504 F.2d 818, 820 n. 3 (9th Cir.1974)). *See also, United States v. Carleo,* 576 F.2d 846, 849 (10th Cir.) ("specific intent to obstruct justice"), *cert. denied,* 439 U.S. 850 (1978); *United States v. Lippman,* 492 F.2d 419 U.S. 314, 316 (6th Cir.1974) ("specific intent to buy silence," not because of other reasons (threats)), *cert. denied,* 419 U.S. 1107 (1975). No one who did not intend to pay a bribe would fall within the statute; good faith, too, is inconsistent with "willfully."

*See, e.g., Williamson v. United States,* 207 U.S. 425, 453 (1907) (good faith inconsistent with conspiracy to suborn perjury).

My reading of the facts indicates that little more is involved here than a good faith effort to settle a pending civil matter. A settlement of the civil aspects of criminal matters is simply not illegal. *See Restatement of Contracts* § 548, p. 1053 (1932). "Chapter 73—Obstruction of Justice" does not, in short, "prohibit ... the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding." 18 U.S.C. § 1515(b).

It is difficult for me to see how this sort of settlement could be fairly construed as "bribery." Settlements, not only of RICO claims, but also of anti-trust and securities matters always involve the settlement of issues that raise at least a possibility of a parallel criminal prosecution. Confidentially agreements, too, are not unique. In fact, they are a common feature of the settlement of civil litigation generally. Far from being illegal, they maybe judicially enforced in the face of general policy considerations supporting public access to court records. *See, e.g., Bank of America National Trust & Saving Assn v. Hotel Rittenhouse Associates,* 800 F.2d 339, 344 (3rd Cir.1986) (common law right of access given priority over confidentiality) (sharp dissent by Garth, J); *Palmieri v. State of New York,* 779 F.2d 861, 864–65 (2d Cir. 1985) (*FDIC v. Ernst & Ernst* followed); *FDIC v. Ernst & Ernst,* 677 F.2d 230, 232 (2d Cir.1982) (access not permitted) *affirming,* 92 F.R.D. 468, 472 (E.D.N.Y.1981) ("[s]ecrecy of settlement terms ... "is a well-established American litigation practice"). An effort to use the blunt instrument of the criminal law to second guess good faith civil negotiations in the RICO—or any other area—would be, not only unauthorized and unprecedented, but also profoundly unwise.

### IV. *Personal Information*

You may find it relevant to know that I have been professionally associated with Mr. Kravit's and am personally aware of his background as a former assistant in the

Eastern District of Wisconsin; he and I have served together on several panels lecturing to executives, lawyers and insurance fraud investigators on the application of criminal and civil RICO in the insurance fraud area. In addition, I personally know his reputation, as a lawyer, for judgment, skill, and integrity; it is of the highest.

A prosecution on this set of facts of this individual would be a travesty of justice.

Sincerely,

/s/ G. Robert Blakey

G. Robert Blakey

O'Neill Professor of Law

Att. 14

1103 West Wisconsin Avenue
Milwaukee, Wisconsin 53233
414-288-5364

March 14, 1990

Atty. David B. Bukey

Bukey & Bentley

1111 Third Avenue, Suite 1060

Seattle, WA 98101-3202

Re: Kravit/Van Engel: Tapes Issues

Dear Mr. Bukey:

## FACTS

A number of tape recordings of conversations were made over a period of approximately one year by Gerald Baake, a business associate of Mr. Kurt Van Engel. Participants in the recorded conversations, other than Mr. Baake, were not aware that the conversations were being recorded by Mr. Baake.

Mr. Baake filed a civil action against Mr. Van Engel in May of 1987, alleging RICO and other claims. Mr. Baake intended to use the tape recordings as evidence in the suit. At about the same time, a separate civil action containing parallel allegations was filed by Anthony Zingale, also a business associate of Mr. Van Engel. Both suits were soon thereafter voluntarily dismissed without prejudice.

Negotiations between Mr. Van Engel and Mr. Baake led to a settlement of all claims by Mr. Baake in October of 1987. As part of that settlement, Mr. Baake agreed to turn over to Mr. Van Engel the original tape recordings in his possession. Mr. Kravit took possession of the tapes in October of 1987. Mr. Kravit was advised that copies of the tape recordings had been made and were in Mr. Zingale's possession.

In the summer of 1987, Mr. Kravit learned that Mr. Baake, through his attorney, had advised an Assistant United States Attorney of his claims against Mr. Van Engel and provided the Assistant United States Attorney with copies of the complaints in the civil actions. In August of 1987, Mr. Kravit met with an Assistant United States Attorney to determine whether Mr. Van Engel was the subject of an investigation related to the civil claims. Mr. Kravit was advised that no investigation was being conducted by the government at that time.

In October of 1987, Mr. Kravit delivered the original tape recordings to Mr. Van Engel. Subsequently, subpoenas were issued to both Mr. Kravit and Mr. Van Engel calling for the production of certain materials. In the course of responding to the subpoenas, Mr. Kravit truthfully advised the Assistant United States Attorney that neither he nor Mr. Van Engel had possession of the tapes.

## ISSUE

You have asked for my opinion, based upon the foregoing facts, whether Mr. Kravit violated ethical norms of the legal profession by his conduct.

## OPINION

Because the conduct in question occurred prior to the effective date of the current Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, the relevant ethical norms are found in the Code of Professional Responsibility, *Wisconsin Court Rules and Procedure,* Supreme Court Rules Chapter 20 (West 1987), which were then in effect. The most relevant provisions of the Code provided:

1) A lawyer shall ... [p]romptly pay or deliver to the client as requested by the client ... properties in the possession of the lawyer which the client is entitled to receive (SCR 20.50(2)(d));

2) A lawyer may not suppress any evidence that the lawyer or the lawyer's client has a legal obligation to reveal or produce (SCR 20.43(1));

3) In his representation of a client, a lawyer may not ... [c]onceal or knowingly fail to disclose that which the lawyer is required by law to reveal (SCR 20.-36(1)(c)); and

4) In his representation of a client, a lawyer may not ... [c]ounsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent (SCR 20.36(1)(g)).

1. The Duty to Deliver Property to the Client

A lawyer has a duty to deliver to the client, upon his request, any property in the lawyer's possession belonging to the client. SCR 20.50(2)(d). Client files generally belong to the client and the client is entitled to them upon completion of a matter. See, for example, State Bar Ethics Committee, Formal Op. E–82–7 ("delivery should be made to the client of all material 'which it could reasonably be anticipated would be useful to the client.'"); Formal Op. E–85–5 ("Important documents should be returned to the client if feasible ..."). The tape recordings in Mr. Kravit's possession were part of Mr. Van Engel's case file and, as such, were property that Mr. Van Engel was generally entitled to receive from Mr. Kravit.

Moreover, the lawyer, as agent for his client/principal, is bound to follow the directions of his principal and may be liable for failing to do so. *Olfe v. Gordon*, 93 Wis.2d 173, 286 N.W.2d 573 (1980) ("... an attorney may be liable for all losses caused by his failure to follow with reasonable promptness and care the explicit instructions of his client" quoting Note, *Attorney Malpractice*, 63 Colum.L.Rev. 1292, 1302 (1963)). More particularly, in determining the method of disposition of client files, "the instructions and wishes of the client should be a dominant consideration." SCR 20.21(6) (ethical consideration). Thus, if Mr. Van Engel had directed Mr. Kravit, as his lawyer/agent, to turn over materials to which Mr. Van Engel was generally entitled, ethics rules and the law of agency as expressly applied to Wisconsin lawyers by the Wisconsin Supreme Court, would have required Mr. Kravit to comply with that direction, some affirmative duty imposed on Mr. Kravit dictated otherwise.

As a general matter, it would be incumbent on an attorney to deliver materials such as the tapes to his client, if his client so directed, absent some serious contervailing consideration.

2. The Duty not to Suppress or Conceal That Which There is an Obligation to Reveal or Produce

Under both SCR 20.43(1) and 20.36(1)(c), the duty not to suppress or conceal evidence or information is expressly conditioned on whether there is a duty to "reveal or produce" the evidence or information. Any duty to reveal or produce the tapes would be an exception to the general rule that a lawyer may not knowingly reveal a confidence or secret of his or her client. SCR 20.22(1)(a). The threshold question, therefore, is whether Mr. Kravit had a duty to reveal or produce the tapes. If such a duty existed, it is then necessary to determine whether Mr. Kravit "suppressed" or "concealed" the tapes by delivering them to Mr. Van Engel.

Mr. Kravit was aware that the civil action by Mr. Zingale might well be re-instituted in state court. He knew that the government was not investigating Mr. Van Engel with regard to the conduct at issue in the civil actions. Considering these facts, I am unaware of any duty imposed upon Mr. Kravit to reveal or produce the tapes. If Mr. Kravit had known of the issuance of a subpoena for the tapes, a duty to reveal or produce the tapes would arise under state or federal statutes and SCR 20.43(1) and 20.36(1)(c). No subpoena

had been issued for the tapes, and, thus, no duty arose on that basis.

Some cases indicate that lawyers are legally required to turn over to prosecutors or courts fruits of apparent crime, such as stolen money, or instrumentalities of crime, such as weapons. See C. Wolfram, *Modern Legal Ethics* sec. 12.3.5 (1986). The circumstances known to Mr. Kravit were markedly different than in those cases. Mr. Kravit was informed by the Assistant United States Attorney that the conduct of Mr. Van Engel at issue in foreseeable civil claims was not then the subject of a criminal investigation. The tapes also contained statements by Mr. Van Engel, so that the tapes could not be turned over without disclosing Mr. Van Engel's identity and information about him. In this respect, the tapes are significantly different from the products or instrumentalities of crime. On the basis of these facts, Mr. Kravit would have virtually no basis for turning the tapes over to prosecutors or a court. The Code of Professional Responsibility provided:

> While serving as advocate, a lawyer should resolve in favor of his or her client doubts as to the bounds of the law. In serving a client as advisor, a lawyer in appropriate circumstances should give his or her professional opinion as to what the ultimate decisions of the courts would likely be as to the applicable law. SCR 20.34(1)(c) (ethical consideration).

Mr. Kravit was serving as an advocate for Mr. Van Engel with respect to the matters to which the tapes were arguably relevant. One set of claims had been settled, and another set of parallel claims was likely to be prosecuted in a state court civil action. As an advocate, Mr. Kravit was encouraged by the Wisconsin Code of Professional Responsibility to resolve doubts in favor of Mr. Van Engel as to whether he was legally bound to reveal or produce the tapes. The principle of confidentiality and Mr. Van Engel's interests dictated that Mr. Kravit not reveal or produce the tapes. At most, Mr. Kravit would be in doubt as to the bounds of the law with respect to whether he was required to reveal or produce the tapes. More likely, Mr. Kravit would find in Wisconsin law no basis whatsoever for revealing or producing the tapes. Indeed, a Memorandum Opinion by the State Bar Ethics Committee advises lawyers not to disclose information known to a lawyer about objects of a client found at a crime scene; the decision whether to disclose, according to the opinion, is the client's decision to make. State Bar Ethics Committee, Memorandum Op. 11/77.

Any other construction of the Code would create enormous ethical problems for lawyers. If lawyers were bound to evaluate all material they receive as to whether it could constitute evidence of a crime and so had to be revealed or produced, the principle of confidentiality would be lost. The mere potential that materials received by the lawyer could be evidence of a crime is far too loose a standard upon which to impose a duty to reveal or produce the material, and no reasonable construction of the Code would support such a standard.

For these reasons, Mr. Kravit had no duty to "reveal" or "produce" the tapes, and his conduct did not violate Wisconsin ethical norms for lawyers. Even if such a duty existed, there is substantial doubt that delivering the tapes to Mr. Van Engel "suppressed" the tapes under SCR 20.43(1) or "concealed" them under SCR 20.36(1)(c). At the least, Mr. Kravit would not have suppressed or concealed the tapes by delivering them to Mr. Van Engel unless he had some substantial reason to believe that Mr. Van Engel would make the tapes unavailable.

3. The Duty Not to Counsel or Assist the Client in Conduct the Lawyer Knows to be Illegal

As established earlier, Mr. Kravit had no legal duty to "reveal" or "produce" the tapes. Having been advised that no federal criminal investigation was taking place, and knowing that a possible civil claim could be asserted in a Wisconsin state court, Mr. Kravit would properly look to Wisconsin law, including the Wisconsin ethics rules, to determine whether he had a duty to preserve the tapes.

Under Wisconsin law, Mr. Kravit had no duty to preserve the tapes. No such duty can be found in the Wisconsin Code of Professional Responsibility. See, e.g., C. Wolfram, *Modern Legal Ethics* sec. 12.3.5 (1986) ("The approach of the 1969 Code was not to create independent rules requiring preservation of evidence."). It is a violation of Wisconsin criminal law to destroy, conceal, or transfer possession of a document that has been subpoenaed by a court or by or at the request of a district attorney or the attorney general, but no such subpoena was issued for the tapes. Wis. Stat. sec. 946.60 (1987–88). Civil sanctions can be imposed in a pending matter in which a party fails to obey an order to provide or permit discovery, but no such order was issued affecting the tapes. Wis. Stat. sec. 804.12 (1987–88).

In summary, all of the relevant Wisconsin law that Mr. Kravit could have consulted would reveal no duty to preserve the tapes. Thus, under the facts known to Mr. Kravit, even if he had counseled Mr. Van Engel to destroy the tapes, he would not have violated SCR 20.36(1)(g) or other provisions of the Wisconsin Code of Professional Responsibility.

Sincerely,

/s/ Michael K. McChrystal

Michael K. McChrystal

Associate Professor

refuses to pay all or part of the fees owed is engaging in unethical conduct especial' the client is prejudiced by such inaction, attorney's proper remedy is to seek withdrawal from the case. In withdrawing he must take reasonable steps to avoid prejudice to the client, including giving the client due notice, allowing time for employment of new counsel and delivering all papers and any property to which the client is entitled. If any fee is unpaid, the attorney's remedy is at law.

The substituting attorney should not proceed until employment of the first attorney is terminated but need not wait until the first attorney has been paid. In fact, to do so may prejudice the client.

**9/77 A, Advertising in High School Annual.** It would not be improper for an attorney to purchase an advertisement in the local high school annual.

**9/77 B. Withdrawn.**

**9/77 C, Representation of Criminal Defendants When Partner's Spouse Is Prosecutor.** It is not per se unethical for members of a firm to represent criminal defendants when the prosecutor is the spouse of one of the firm's partners. Extreme care should be taken, however, to avoid a conflict of interest or the appearance of impropriety. In that regard, the partner whose spouse is a prosecutor should not represent defendants when the spouse appears as the prosecutor. Partners in the firm should fully inform clients before representation is taken, that their partner is married to the prosecutor and proceed only if the client consents after such disclosure.

**11/77, Attorney-Client Privilege; Disclosure of Information.** An attorney who is aware that an object of his/her client's was found at the scene of alleged criminal misconduct is not under an ethical obligation to disclose the existence of the object or where it was found to the authorities. S/he should discuss the matter with her/his client and it is the client's decision whether to disclose the information. The attorney must, however, tell the client s/he cannot lie about the item and that s/he must tell the truth about it if questioned concerning it.

**12/77, Advertising in Church Bulletins.** It is not improper for an attorney to place an advertisement in a church bulletin.

**1/78 A, Conflict of Interest—Attorney Joins Other Firm.** When an attorney moves from a firm representing one side of a claim to a firm representing the other side, whether either firm must withdraw depends upon the extent of the moving attorney's involvement. If s/he was involved in the claim or litigation before the move, the second firm could not continue to represent the other side after the attorney moved there. If s/he was insulated from the claim while with the first firm and does not become involved in the matter as a member of the second firm, both firms may continue their representation if both clients are fully advised of the situation and consent after being so informed.

**1/78 B, Paralegals.** Use of paralegals is ethical and to be encouraged because it offers the opportunity to provide legal services to more people at potentially lower costs. There are ethical problems involved, however, particularly in the area of avoiding the unauthorized practice of law. In general, to avoid charges of fostering the unauthorized practice of law, an attorney must be primarily responsible to the client for any work done by a paralegal. What specific work a paralegal may perform is best answered on a case-by-case basis. It appears s/he could ethically negotiate settlements providing the attorney retains final discretion whether to accept or reject an offer.

Attorneys who use paralegals should keep in mind the prohibition stated in DR 3-102 against sharing of fees with a non-lawyer. The ABA has concluded, however, in Informal Opinion 1333, that an attorney may ethically itemize on a fee statement the time spent on a matter by a law student, so long as the student's limitation as a non-attorney is clearly stated. The prohibition in DR 3-103 against forming a partnership with a non-attorney if the partnership engages in the practice of law should also be kept in mind.

Paralegals may sign correspondence which is incident to their responsibilities, provided their capacity is carefully spelled out to avoid the impression that they are an attorney.

Paralegals may not be listed on a firm's letterhead even with a designation as to their capacity. They may, however, use a business card containing the name, designation and the firm's name.

It would not be per se unethical for two or more law firms to share the services of a paralegal as long as the cautions against divulgence of a client's confidence, secrets and the avoidance of conflicts of interest are scrupulously avoided.

**2/78, Office Sharing.** Attorneys who "share" office space, secretarial help and other facilities should keep several ethical considerations in mind. They should not hold themselves out as in partnership with those with whom they are not in fact partners. Consequently, office signs, letterheads, professional cards and the like should not create the impression of a partnership. The use of "associates" is also not proper in office-sharing situations. The arrangement of offices should be such as to belie the impression of a partnership.

Nonpartner attorneys sharing offices must also observe prohibitions against conflicts of interest. The rule that when an attorney may not accept employment because of a conflict of interest no one else in her/his firm may accept the employment extends to attorneys sharing office facilities.

**3/78 A, Sale of Law Practice.** It is improper to offer a law practice for sale. A lawyer's clients are not merchandise, nor is a law practice properly the subject of sale. A lawyer may properly sell the physical assets of her/his practice, and those accounts receivable which represent work completely finished. As for accounts representing work in progress, the client must be informed s/he is free to select any attorney to finish the

work begun by attorney whose law practice is ended.

**9/78 B, Advertising in Baseball Scorebook.** It would not be improper for a law firm sponsor of a local baseball team to have its name listed with other sponsors in a baseball scorecard booklet.

**3/78 C. Withdrawn.**

**4/78 A, Consolidation of Firm; Letterhead Designation; Announcement to Clients.** When two law firms consolidate, it is not proper for either of them to designate the other on its letterhead as "Of Counsel." Such term is properly used only in reference to individuals and not to law firms. Similarly, reference to the other firm as "Associated With" would be improper if it misleads the public as to the exact nature of the relationship. The term "Associates" properly describes an employer-employee relationship where the employed attorney generally does not share in responsibility and liability for the acts of the firm or the lawyer employees.

As for the listing on each firm's letterhead the areas of specialization of both firms, it would appear this is not improper under the Wisconsin Supreme Court's Order of December 23, 1977. The standard to be observed is the avoidance of any false, deceptive or misleading information.

It would also appear to be proper for one of the firms, which deals largely with labor law matters, to send an announcement to the membership of its union clients regarding the association of firms, along with informational pamphlets on various legal problems the labor law firm does not handle, but the other law firm does handle.

**4/78 B, Return of Client's Files.** An attorney must return to a client all documents and other materials the client has given to the attorney. S/he must also return any "end product" materials for which the client has paid. These items must be returned whether or not the client agrees to pay for photocopies.

The attorney is not required to furnish to the client internal notes and memos generated primarily for the attorney's own purposes in working on the client's matters. If the client requests copies of these types of materials and the attorney agrees to furnish them, it would be proper to charge the client a reasonable amount to cover the expense of copying them.

**4/78 C, Permissible Activities of a Law Clerk.** A lawyer not yet admitted to the State Bar is properly designated as a law clerk and as such is not permitted to conduct activities constituting the practice of law, which are reserved for attorneys admitted to practice. Specifically, a law clerk may perform the purely clerical function of entering the appearance of her/his employer as a matter of record at depositions. However, the making of objections at depositions may not be properly done by a law clerk. As for a law clerk's attendance at pretrials, motions and hearings on behalf of her/his employer, this should also be left for an attorney except for purely clerical matters.

Att. 15

OFFICE OF THE DEAN
735 West New York Street
Indianapolis, Indiana 46202–5194
(317) 274–8523

INDIANA UNIVERSITY
SCHOOL OF LAW
INDIANAPOLIS

October 20, 1989

David B. Bukey, Esq.

Bukey & Bentley

1111 Third Avenue, Suite 680

Seattle, Washington 98101–3202

Re: Your Client—Stephen Kravit

Dear Mr. Bukey:

You retained me as an expert in the field of legal ethics to review certain matters in connection with your representation of Stephen Kravit, who I understand may be the subject of a federal investigation in Milwaukee in connection with his representation of Kurt Van Engel.

Specifically, you asked that I review a "Confidential Settlement Agreement" negotiated by your client on behalf of Mr. Van Engel and dated October 7, 1987. You requested that I give you an opinion as to whether Mr. Kravit engaged in unprofessional conduct in negotiating and in preparing this agreement, and in counseling his client to sign it.

I have reviewed the "Confidential Settlement Agreement," and I have consulted the Wisconsin Rules of Professional Conduct for Attorneys. I also have examined an "Affidavit" of Special Agent Richard J. Arkenberg of the Internal Revenue Service pertaining to this matter, dated May 13, 1988, and Complaint No. 87–C–0625 filed in the United States District Court for the Eastern District of Wisconsin by Gerald Baake vs. Kurt Van Engel, et al. Finally, I have conversed extensively by phone with you concerning the facts of this case.

It is my opinion that Mr. Kravit's conduct in negotiating and in preparing the agreement was not improper and does not subject him to charges of professional impropriety under either Wisconsin rules or the American Bar Association Standards for Criminal Justice Relating to The Defense Function. It is my understanding that the agreement was executed by the parties in good faith in an effort to settle a civil dispute.

More specifically, I do not believe it was improper for Mr. Kravit to have included paragraph 8 in the "Confidential Settlement Agreement." This paragraph required Gerald Baake to deliver to Kurt Van Engel "all litigation materials, documents, work product, and any other items in his or his counsel's possession...." I understand that at the time the agreement was executed Mr. Kravit had been informed by a government representative that there was a citizen inquiry concerning Van Engel's conduct, but that no investigation was then in progress. Nevertheless, in these circumstances, I believe that the delivery of litigation materials, documents, etc. to Van Engel may be viewed as an appropriate effort by counsel to comply with Standard 4–4.1 of the ABA Criminal Justice Standards Relating to the Defense Function: "[it] is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case...." Moreover, I do not believe it is necessarily improper if litigation materials of the kind described in paragraph 8 of the agreement are delivered to counsel rather than to the client.

Pursuant to your request, I am enclosing a copy of my curriculum vitae. As you can see, I have had extensive experience in the areas of professional responsibility and criminal defense ethics. I am currently a member of the Editorial Board of the ABA/BNA Lawyers' Manual on Professional Conduct and previously served as the board's chairperson. I was the Reporter for the second edition of the ABA's Criminal Justice Standards Relating to The Defense Function, and I now serve, by appointment of the President of the ABA, as the chairperson of the ABA committee charged with responsibility for updating all of the Association's Criminal Justice Standards, including The Defense Function

Standards. I also served as Chairperson of the ABA Section of Criminal Justice during 1986–1987.

As noted at page 8 of my curriculum vitae, I frequently have been retained as an expert on issues of professional responsibility and competence of representation. In addition, I have published articles pertaining to professional responsibility and lectured on the subject. I have taught professional responsibility in law schools every year since 1975. For a number of years, I lectured on professional responsibility to students preparing to take the bar examination in Georgia and North Carolina.

Please feel free to let me know if you require any additional information at this time.

Sincerely,
Norman Lefstein
Dean and Professor of Law

Enclosure