UNITED STATES of America,
Plaintiff-Appellee,

v.

Howard C. FLOMENHOFT,
Defendant-Appellant.

No. 82–2482.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1983.

Decided July 26, 1983.

Rehearing and Rehearing En Banc
Denied Sept. 21, 1983.

Robert L. Graham, Jenner & Block, Chicago, Ill., for defendant-appellant.

Vincent J. Connelly, Asst. U.S. Atty., Dan K. Webb-U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before COFFEY, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

Defendant-Appellant Howard C. Flomenhoft appeals his conviction on 61 counts of mail fraud (18 U.S.C. § 1341) and two counts of making false statements on income tax returns (26 U.S.C. § 7206(2)), and raises three issues for our consideration:

I. Whether Flomenhoft's indictment is invalid as constituting an abuse of grand jury process;

II. Whether the district court erred in denying Flomenhoft's motion for a judg-

ment of acquittal, or, alternatively, for a new trial;

III. Whether the district court erred in failing to tender a "missing witness" instruction?

For the reasons stated below, we affirm Flomenhoft's conviction.

### FACTS

This case stems from an Internal Revenue Service (IRS) news release issued on October 29, 1976. Prior to this date, a skillful investor could structure his investments in such a manner as to generate tax deductible losses which far exceeded the investor's actual monetary investment. One common way that this was accomplished was through investments in coal mining operations. The investors would establish a limited partnership consisting of a single general partner and a number of limited partners who were the actual investors. The investment generated tax-deductible losses through an advance royalty payment to the lessor of the coal mining operation. This advance royalty payment generally consisted of two components: the cash investment of the investors and a non-recourse promissory note pledged by the partnership to the lessor. Revenue Rulings 70–20 and 74–214 permitted the advance royalty payment to be deducted in full in one year, thus allowing investors tax deductions far exceeding their actual cash investment.

On October 29, 1976, the IRS issued news release IR–1687 which suspended Revenue Rulings 70–20 and 74–214 and announced the IRS' intention to revise the tax treatment of advanced royalty payments *effective as of October 29, 1976.*[1] The release

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

1. IRS News Release IR–1687 read as follows:
   Washington, D.C.—A proposed amendment to the Income Tax Regulations that would modify the treatment of advanced royalties under coal and other mineral leases will be published next week in the Federal Register, the Internal Revenue Service today

announced. The amendment would affect the year of deductibility of advanced royalties.
   Under the proposed amendment, the treatment of advanced royalties would be revised, effective October 29, 1976, unless the advanced royalties are required to be paid pursuant to a mineral lease which (i) was binding prior to that date upon the party who in fact pays or accrues such royalties, or (ii) was required, pursuant to a written contract, to be executed by the party who in fact pays

did provide, however, that binding mineral lease agreements entered into prior to October 29, 1976 would still qualify for the favorable tax treatment which had been accorded advance royalty payments under Revenue Rulings 70–20 and 74–214.

Defendant-Appellant Flomenhoft, formerly an IRS attorney, specialized in tax planning for corporations and individuals. A large portion of his private practice consisted of counseling investors in tax shelters. Flomenhoft was aware of the favorable tax treatment accorded advance royalty payments prior to News Release IR–1687 and was actively investigating coal mining operations as possible investments and tax shelters for his clients. He had been unable to find a coal mining operation to serve as a tax shelter prior to the October 29 deadline, but in early November, Flomenhoft discovered Aminex Resources Corporation, a New York Corporation which allegedly had established binding contracts for mineral lease rights to several Kentucky coal mines prior to the October 29 deadline.

Flomenhoft had met on several occasions with Aminex officials to discuss transfer of the mineral lease rights. In mid-November 1976, he established two Illinois limited partnerships (Polls Creek Associates and Morgan Associates) and antedated the partnership documents to make it appear that the partnerships had been established prior to the October 29 deadline. These falsely dated documents were then distributed through the mail to potential investors. Flomenhoft represented to investors that the partnerships and the binding mineral leases were in place prior to the October 29 deadline, thus qualifying for the old favorable tax treatment. Based upon these representations, numerous investors made substantial monetary investments in both Polls Creek Associates and Morgan Associates.

### THE GRAND JURY PROCEEDING

In October 1981, the Special November 1978 Grand Jury (hereinafter "the first grand jury") indicted Flomenhoft on 61 counts of mail fraud. Flomenhoft moved to dismiss the first grand jury's indictment, alleging that the government had exculpatory evidence in its possession which it failed to present to the first grand jury. Although the district court denied Flomenhoft's motion to dismiss the indictment, the government informed the district court that it would seek a superseding indictment against Flomenhoft to add two tax charges and clear up any possible defects in the first grand jury proceeding. The government stated to the court that it would " . . . put absolutely everything we are now aware of into that new grand jury." (Transcript of Proceedings, April 15, 1982, p. 34).

By letter dated April 5, 1982, the government asked Flomenhoft what information he desired be presented to the newly empaneled grand jury (hereinafter "the second grand jury"). Flomenhoft requested that the alleged exculpatory evidence excluded from the first grand jury be presented to the second grand jury. Flomenhoft also requested that ten specific live witnesses be

---

or accrues such royalties, provided that such party establishes, to the satisfaction of the Secretary or his delegate, that under all the facts and circumstances the contract was binding upon such party prior to that date. For purposes of clause (ii) above, a contract will in no event be considered to be binding upon such party if the obligations imposed on such party prior to October 29, 1976 were not substantial or were illusory.

Section 1.612–3(b)(3) of the Income Tax Regulations as revised by the proposed amendment is attached.

In addition, two rulings concerning the Federal income tax treatment of certain advanced royalties paid by lessees under coal or other mineral leases have been suspended as a result of this proposed modification of section 1.612–3(b)(3) of the regulations.

Suspended are Revenue Ruling 70–20 (1970–1 C.B. 144) and Revenue Ruling 74–214 (1974–1 C.B. 148). Under Rev.Ruls. 70–20 and 74–214 certain advanced payments are deductible by the payor-lessee in the taxable year paid or accrued under the election provided under section 1.612–23(b)(3) of the Income Tax Regulations.

As a result of suspension of these Revenue Rulings taxpayers may not rely on the tax treatment provided in these Rulings *on or after* October 29, 1976.

\* \* \* \* \* \*

Attachment

called to testify before the second grand jury to enable the second grand jury to pose any questions that it might have concerning the documentary evidence from the first grand jury.

The government subsequently presented the record of the first grand jury proceeding, as well as the alleged exculpatory evidence requested by Flomenhoft, to the second grand jury. Although the government did not call the witnesses requested by Flomenhoft, it placed transcripts of testimony and documents relating to the ten individuals before the second grand jury and informed the second grand jury that it would subpoena the ten live witnesses requested by Flomenhoft if the second grand jury so desired. The second grand jury did not request the government to subpoena any of the live witnesses Flomenhoft requested, and proceeded to return an indictment charging Flomenhoft with 61 counts of mail fraud and two new counts of filing false statements on a tax return.

### I. *The Grand Jury Indictments*

Flomenhoft attacks his grand jury indictments on several grounds which, for reasons of clarity, this Court will discuss seriatim.

### a). *The Requirement that a Grand Jury Be Independent and Informed.*

Flomenhoft contends that he was never charged by an independent and informed grand jury because the government failed to present exculpatory evidence before the first grand jury. He further contends that the government's failure to present the exculpatory evidence to the first grand jury was not cured by the subsequent submission of the exculpatory evidence to the second grand jury because the second grand jury consisted of entirely different individuals from the first grand jury, and because the government failed to call the ten live witnesses Flomenhoft requested to testify before the second grand jury.

Our analysis of Flomenhoft's contentions must commence with the recognition of the unique role that the grand jury plays in the American criminal process. The purpose of the grand jury is " . . . to provide a fair method of instituting criminal proceedings . . ." *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). Its "mission is to clear the innocent, no less than to bring to trial those who may be guilty." *United States v. Dionisio,* 410 U.S. 1, 16–17, 93 S.Ct. 764, 772–773, 35 L.Ed.2d 67 (1973) (footnote omitted). The grand jury serves as a check on prosecutorial power; it is " . . . a protector of citizens against arbitrary and oppressive governmental action." *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). It is axiomatic, therefore, that the grand jury must be both "independent" and "informed." *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). As Chief Justice Warren noted in *Wood:*

> Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. . . . The necessity to society of an independent and informed grand jury becomes readily apparent . . . .

370 U.S. at 390, 82 S.Ct. at 1373 (1962). To be independent and informed, the grand jury must be able to obtain all relevant evidence, since only then can its judgment truly be informed. *United States v. Mandujano,* 425 U.S. 564, 573, 96 S.Ct. 1768, 1775, 48 L.Ed.2d 212 (1976) (plurality opinion); *United States v. Calandra,* 414' U.S. 338, 343–44, 94 S.Ct. 613, 617–618, 38 L.Ed.2d 561 (1974). Flomenhoft contends that both the first and the second grand jury operated in a factual vacuum: the first was unable to evaluate key exculpatory documents, the second, although having the documents before it, was unable to evaluate the exculpatory testimony because it consisted of entirely new individuals from the first grand jury and did not have the testimony of live witnesses before it. As such, Flomenhoft concludes neither grand jury was independent and informed.

This Court's careful scrutiny of the alleged "exculpatory evidence," which the government failed to present to the first grand jury, causes us to echo the sentiments of trial Judge Leighton who noted ". . . there is a big difference between exculpatory evidence and evidence that may be impeaching in some important or unimportant respect." (Transcript of Proceedings, April 15, 1982, p. 3). Nonetheless, even assuming arguendo that this exculpatory evidence meets the clearly exculpatory standard enunciated in *United States v. Dorfman,* 532 F.Supp. 1118, 1133 (N.D.Ill. 1981) (". . . while prosecutors need not present to the grand jury all circumstances which might be considered exculpatory, they must present evidence which clearly negates the target's guilt."), this is not a case where the government failed to present the exculpatory evidence to the grand jury. *Cf. United States v. Gold,* 470 F.Supp. 1336, 1352–53 (N.D.Ill.1979). All the exculpatory evidence was presented to the second grand jury. The government also informed the second grand jury of its willingness to subpoena any witnesses the second grand jury desired to hear. The second grand jury, after consideration of the evidence before it, simply determined there was no need to subpoena the other ten witnesses.

We hold that the district court properly upheld the grand jury indictment as independent and informed. The second grand jury had before it the entire transcript of the first grand jury as well as the alleged exculpatory evidence which had not been presented to the first grand jury. The government offered to call any necessary witnesses if the second grand jury felt their testimony would be helpful. The second grand jury independently decided that their testimony was unnecessary.

b). *Excessive Hearsay Evidence.*

Flomenhoft contends that the second grand jury relied upon excessive hearsay in returning the superseding indictment. Such excessive hearsay, claims Flomenhoft, deprived the second grand jury of the ability to make an independent and informed evaluation of the credibility of witnesses presented to the first grand jury.

We note initially that hearsay evidence is admissible before a grand jury. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (An indictment based solely on hearsay evidence is valid). Nonetheless, excessive use of hearsay evidence in a grand jury proceeding may violate the defendant's Fifth Amendment rights. *United States v. Estepa,* 471 F.2d 1132, 1136 (2d Cir.1972) ("When the framers of the Bill of Rights directed in the Fifth Amendment that 'no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury,' they were not engaging in a mere verbal exercise."). The grand jury may not become "a rubber stamp endorsing the wishes of a prosecutor as a result of the needless presentation of hearsay testimony in grand jury proceedings." *United States v. Gallo,* 394 F.Supp. 310, 314 (D.Conn.1975).

Flomenhoft relies principally upon *Gallo, supra,* as authority that this Court must dismiss the superseding indictment as based upon excessive hearsay. Our analysis of *Gallo,* however, indicates that it is inapposite to the facts presently before this Court. This is not a case where the prosecutor failed to inform the grand jury "as to the hearsay quality of the evidence they were receiving." 394 F.Supp. at 315. Rather, the record reflects that the prosecutor carefully informed the grand jurors that the evidence they were receiving was hearsay, and that he was willing to produce the actual witnesses if the grand jury so desired. This is not a situation where the prosecutor presented the grand jury with perjured testimony. *Id.,* or "failed to supply the second grand jury with the full and complete record of the proceedings before the first grand jury." *Id.* The sole factor which *Gallo* and the present case share in common is that "the second grand jury was composed of individuals different from those who had first indicted the defendants." *Id.* Defendant has failed to cite any authority to this court that this last factor alone merits dismissal of an indictment, and our research has failed to find

any. The district court properly determined the indictment was not invalid as based upon excessive hearsay.

### c). *Duty to Create Jencks Act Statements.*

■ Flomenhoft argues that the government deprived him of Jencks Act material by failing to call key witnesses before the grand juries. This same argument has been convincingly rejected in *United States v. Cruz:*

> ... no part of the Jencks Act has ever been construed to require the government to *develop* potential Jencks Act statements so that such material can be combed in the hopes of obtaining impeaching inconsistencies.

(emphasis in original) 478 F.2d 408, 411 (5th Cir.1973).

### II. *Scienter*

Flomenhoft contends that he could not have acted with the scienter necessary to sustain his conviction on mail fraud and tax charges because proposed treasury regulation 1.612–3(b) (which changed the favorable tax treatment of advance royalty payments) did not become law until December 19, 1977 when it was published in the Federal Register pursuant to 5 U.S.C. § 553 (1976). Flomenhoft concludes that since all his illegal acts were completed well before the treasury regulation became law, he could not have acted with the scienter necessary to violate the treasury regulation.

■ But Flomenhoft is not charged with violating the proposed treasury regulation; rather Flomenhoft is charged with mail fraud and filing false statements on a tax return. Mail fraud consists of (1) a scheme to defraud and (2) the use of the mail in furtherance of the scheme. *United States v. Keane,* 522 F.2d 534, 544 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). The falsely dated and misrepresentative information Flomenhoft mailed to potential investors "... was reasonably calculated to deceive persons of ordinary prudence ..." *United States v. Shelton,* 669 F.2d 446, 458 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). Flomenhoft

clearly schemed to defraud potential investors when he represented to them that Polls Creek Associates and Morgan Associates qualified for the old favorable tax treatment.

■ Likewise, Flomenhoft completed the partnership tax returns with information which he knew was false and deliberately intended to deceive the IRS. It is not necessary to reach the violation of the proposed treasury regulation and the issue of scienter since Flomenhoft is charged with filing false statements on a tax return, not violating the proposed treasury regulation.

After actively scheming to evade the effect of the treasury regulation, Flomenhoft now argues its invalidity. It has been held that one who furnishes false information to the government in feigned compliance with a statutory requirement may not defend against prosecution by challenging the validity of the requirement itself. *United States v. Knox,* 396 U.S. 77, 79, 90 S.Ct. 363, 364, 24 L.Ed.2d 275 (1969). The district court properly denied Flomenhoft's motions for acquittal and for a new trial.

### III. *The Missing Witness Instruction*

Flomenhoft contends that the district court erred in failing to tender a missing witness instruction based upon the government's failure to call and immunize Russell Bilgore who, argues Flomenhoft, was a key witness to several transactions between Flomenhoft and Aminex.

■ Congress has conferred the power to immunize witnesses uniquely upon the executive branch. *United States v. Frans,* 697 F.2d 188 (7th Cir.1983). The immunization statutes are not designed to benefit defendants. 697 F.2d at 191. Absent a substantial showing of prosecutorial abuse of discretion, courts will not review a prosecutor's immunization decision. *United States v. Frans, supra; In re Perlin,* 589 F.2d 260, 269 (7th Cir.1978); *United States v. Smith,* 542 F.2d 711, 715 (7th Cir.1976) ("The law is clear that in this Circuit a district court is powerless to direct the prosecution to seek use immunity in order to secure testimony which the defendant deems relevant."); *United States v. Rauhoff,* 525 F.2d 1170, 1178 (7th Cir.1975); *United States v. All-*

state Mortgage Corp., 507 F.2d 492, 494–95 (7th Cir.1974), cert. denied, 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975).

Requiring a missing witness instruction each time the prosecution decides not to immunize a witness would constitute a substantial judicial encroachment upon prosecutorial discretion. This is not a case where there has been a clear prosecutorial abuse of discretion violating the due process clause. The district court properly refused Flomenhoft's missing witness instruction.

## IV.  Conclusion

The district court properly determined that there had been no abuse of grand jury process, that Flomenhoft had acted with the scienter necessary to sustain his conviction, and properly refused to tender a missing witness instruction.

The judgment of conviction is AFFIRMED.