In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3097

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BERNARD FOSTER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 316-2—**Ronald A. Guzman**, *Judge*.

ARGUED OCTOBER 25, 2012—DECIDED NOVEMBER 28, 2012

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge.* Bernard Foster sold crack cocaine to a paid confidential informant ("CI") through a series of controlled buys facilitated by federal agents. Foster was charged with several counts of knowingly and intentionally distributing cocaine base, and a jury ultimately convicted him on four separate counts. The district court sentenced him to serve 240 months' imprisonment and 10 years' supervised release. He now appeals his conviction, arguing that the district court improperly ad-

mitted evidence in violation of the Confrontation Clause and improperly rejected his request for a missing witness instruction. He also appeals his sentence, claiming that the district court erred by not applying the Fair Sentencing Act in the imposition of his sentence. We affirm the defendant's conviction and sentence.

## I. Background

On four occasions in 2009, Foster sold crack cocaine to a paid CI of the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). The CI was also the defendant's relative and a convicted felon. Each of the four transactions was audio-recorded, two were video-recorded, and all four were monitored live by a team of ATF agents.

### A. First Controlled Buy

On February 12, 2009, ATF agents met with the CI prior to the first controlled buy from the defendant. Agents searched the CI and his vehicle for firearms, narcotics, and currency before the transaction and did not find anything. Agents then provided him with $2,300 and a scale, and directed the CI to purchase 63 grams of crack cocaine from the defendant.

The CI arrived at the parking lot of a Popeye's Chicken restaurant located at 95th Street and Vincennes Avenue at the pre-arranged time of the transaction, where he met the defendant. ATF agents monitored the scene through stationary surveillance. The defendant and the CI had a

recorded conversation inside of a vehicle, after which the defendant approached a nearby red Dodge Charger and then returned to the vehicle in which he and the defendant were conversing. The defendant then told the CI, "Alright. He said give him 17. For that, man. That's two. Two whole." The CI responded, "(UI) That's 56. Supposed to be 60 . . . [q]uantity is off." The defendant responded "[g]ive me sixteen fifty. That's why I say 17." After the conversation, the CI drove out of the parking lot and traveled to a debriefing location. Agents met with the CI at this location and took custody of the crack cocaine, the scale, and the recording device that had been provided to the CI prior to the transaction. The agents again searched the CI and his vehicle for any narcotics, firearms, or currency and did not recover any. The purchased crack cocaine weighed approximately 54.9 grams.

## B. Second Controlled Buy

On February 24, 2009, ATF agents again met with the CI and searched him and his vehicle for narcotics, firearms, and currency. Nothing was found. Agents provided the CI with $2,550 to purchase 63 grams of crack cocaine from Foster. Some agents went to set up surveillance at the buy location, while others followed the CI to the parking lot of Popeye's Chicken at 95th Street and Vincennes Avenue. En route, the agent and the CI made at least two stops, including one in which the CI pulled over and searched for his cell phone. At another point, the CI pulled over and told the agent that he did not have

a scale. The agent provided him with a scale. The CI then continued to the parking lot, and the defendant arrived shortly afterward. The defendant and the CI discussed the fact that the weight of the drugs had been off in the February 12, 2009 transaction. The defendant then left the CI's vehicle, walked to a nearby barbershop, and entered a Jeep. After exiting the Jeep, the defendant returned to the CI's vehicle. The CI and the defendant then had the following exchange:

Foster:     Here. Got it all?

CI:         Yeah.

Foster:     You okay?

CI:         I'm okay, buddy.

Foster:     Okay then. Why you always have nothin' but hundreds?

CI:         'Cause it's easier to count.

Foster:     This 18?

CI:         Ye . . . yes, sir. And you got your 50.

Foster:     Mmm-hmm. Now what you say you wanted?

CI:         A quarter key.

Foster:     Alright. Alright. Quarter key?

CI:         Uh, yeah. Give me a call. Give me a ring.

Foster:     I'll call you on it. With it.

Foster then exited the vehicle, and the CI drove to a pre-arranged location. Agents followed the CI to the

debriefing spot, where they retrieved the crack cocaine, as well as the scale, transmitter, and unexpended funds that had been provided to the CI. Agents searched the CI and his vehicle for any narcotics, firearms, or currency and found none. The crack cocaine weighed 57.6 grams.

### C. Third Controlled Buy

On March 20, 2009, ATF agents met with the CI to prepare for the third controlled buy. Agents searched the CI and his vehicle for narcotics, firearms, and currency and found none. They provided the CI with $2,200 to purchase crack cocaine from the defendant. In addition to providing the CI with an audio-recording device and transmitter, the agents also provided him with a video-recording device. A surveillance team again monitored the buy. After stopping at a gas station for five or six minutes, the CI arrived at the Citgo parking lot located at 99th Street and Vincennes Avenue. The defendant walked over to the CI's vehicle and spoke to the CI. The defendant then drove out of the parking lot and returned a short time later, re-approaching the CI's vehicle and engaging in another conversation with him. The CI then exited the Citgo lot and traveled to the debriefing location, where he met with ATF agents. The agents retrieved the crack cocaine he purchased, as well as the transmitter and recording devices. Agents searched the CI and his vehicle for narcotics, firearms, and currency and found none. The purchased crack cocaine weighed approximately 64 grams.

**D. Fourth Controlled Buy**

On April 2, 2009, agents again met with the CI to arrange a fourth controlled buy. Prior to the transaction, the agents searched the CI and his vehicle for narcotics, firearms, and currency and found none. Agents provided the CI with $2,600 to purchase crack cocaine from the defendant, as well as a scale, an audio/video recording device, and a transmitter. Some agents again monitored the predetermined buy location, the Popeye's restaurant on 95th Street and Vincennes Avenue, while others followed the CI to the location. While the agents' surveillance view was blocked at times, Agent Vernon Mask testified that the defendant arrived at the parking lot in a blue van and walked back and forth several times between the van and the CI's vehicle, updating the CI on the whereabouts of his supplier. A grey Chevy Impala arrived, occupied by the defendant's crack cocaine supplier, Justin Gardner. After spending a couple of minutes in the Impala, Foster returned to the CI's vehicle. After the transaction, the CI drove to the debriefing location, where he provided the agents with the crack cocaine he had purchased, the scale, the transmitter, and unexpended funds. Agents again searched the CI and recovered nothing. The crack cocaine weighed approximately 61 grams. In the meantime, Chicago police officers had followed the Impala away from the parking lot, stopped it, and eventually arrested Justin Gardner (defendant's supplier). All of the crack cocaine purchased by the CI from the defendant was analyzed and confirmed to be crack cocaine.

On April 6, 2009, Foster was charged with one count of knowingly and intentionally distributing 50 grams or

more of cocaine base, in violation of 21 U.S.C. § 841(a)(1). On May 14, 2009, a federal grand jury returned a superseding indictment, charging Foster and another defendant with narcotics trafficking-related offenses. The earlier complaint was dismissed on the government's motion. On July 30, 2009, the grand jury returned a second superseding indictment charging Foster and another defendant with narcotics-trafficking offenses. Foster was charged in Count One with knowingly and intentionally distributing 5 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1); in Counts Two, Three, Four, and Six with knowingly and intentionally distributing 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1); and in Count Five with unlawfully possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). On August 17, 2009, the government filed a second notice of its intention to seek an enhancement of the defendant's sentence pursuant to 21 U.S.C. § 851.

On November 12, 2009, the government provided information to the defense suggesting that the CI and one of the agents had provided incorrect testimony to the grand jury regarding the amount of money that was exchanged in one of the drug transactions.[1] The district court determined that sufficient probable cause existed

---

[1] Apparently, the CI had a secondary deal with Foster to steal money from ATF. Relatedly, ATF Agent Mask stated an inaccurate number before the grand jury when he discussed the amount of money that was exchanged during one particular transaction. However, the defense did not claim that Agent Mask knowingly misrepresented the number.

such that the inaccurate testimony did not prejudice the defendant's right to a probable cause determination by a grand jury, reasoning that the evidence, even cleansed of such inaccuracies, was overwhelming as to probable cause.

On November 16, 2009, the government orally moved to dismiss Counts Three and Five of the second superseding indictment, and the district court granted the motion. Foster entered pleas of not guilty as to all counts, and the case proceeded to a jury trial. On November 20, 2009, a jury convicted the defendant on Counts One, Two, Four and Six. On August 1, 2011, the district court sentenced the defendant to serve concurrent terms of 240 months' imprisonment on Counts One, Two, Four, and Six, followed by concurrent terms of 10 years' supervised release on each of the four counts.

## III. Discussion

### A. The district court did not err in admitting recorded statements of the non-testifying confidential informant and the testimony of the ATF Agents

### (i) Waiver, Forfeiture, and Standard of Review

Foster first argues that the district court violated Rule 802 of the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment by improperly admitting statements of the non-testifying CI and the testifying ATF agents. He notes that the district court ruled definitively in a pretrial order in response to the government's motion *in limine* that: (1) the CI's out-of-court recorded

statements were admissible subject to the prosecution laying a proper foundation, and (2) the testimony of the CI was admissible to challenge the truth of any statements at issue or for the purposes of impeachment. Foster initially had objected to the admission of the CI's recorded conversations with defendant on Confrontation Clause and foundational grounds in his response to the government's motion *in limine*. However, Foster did not object based on hearsay or Confrontation Clause grounds at trial when the recordings were played. Nevertheless, he suggests that under the Federal Rules of Evidence, he was not required to object again below to preserve the Confrontation Clause issue for appeal. Fed. R. Evid. 103(b) (where a court "rules definitively on the record—either at or before trial—a party need not renew an objection or offer proof to preserve a claim of error for appeal").

The government acknowledges that Foster initially raised both Confrontation Clause and foundational objections to the admission of such testimony. However, it argues that during the pretrial conference defense counsel advised the district court that the parties were attempting to reach an agreement regarding the removal of testimonial statements from the recordings, which would "save [the court] . . . the trouble of ruling on it." The government subsequently removed the statements to which the defendant objected, after which the focus of the district judge's conversations with the parties shifted to foundational requirements.

The government argues that Foster accordingly waived any Confrontation Clause objection by with-

drawal, such that appellate review is improper. *See United States v. Cunningham*, 405 F.3d 497, 502 (7th Cir. 2005) ("Although Cunningham's trial counsel initially objected [at trial] to the admission of the pictures, he later explicitly withdrew his objection and furthermore failed to make any additional objections" and accordingly waived the objection). We explained in *United States v. Pittman* that where a party's "trial counsel affirmatively represented that he had no objection to the admission of evidence," the issue is waived. 319 F.3d 1010, 1012 (7th Cir. 2005) (citing *United States v. Cooper*, 243 F.3d 411, 416-17 (7th Cir. 2001)). There, while Pittman's counsel "initially reserved the right to file a responsive brief" on the issue of whether certain evidence was admissible, "he later stated at trial that he had no objection to the use of the evidence." *Id.* at 1011. In *Cooper*, the case upon which *Pittman* relies for the proposition that explicitly withdrawn objections are waived, the defense counsel explicitly withdrew his motion *in limine* which had objected to the admission of certain evidence. 243 F.3d at 414 ("I think I will withdraw the entire motion. How's that sound?") (internal quotation marks omitted).

In the present case, during a pretrial conference to address the government's motion *in limine*, Foster's counsel said the following regarding the CI's recorded statements:

> Judge, to the degree that those recordings are—have a hearsay element to them, we've—we have had a discussion [with the government] earlier this morning. We think we can resolve most of our issues with

the transcripts in the content of the—of the recordings. If we can resolve that and take out anything that is testimonial from those recordings, then I think we will not have an objection to that.

Further, Foster's counsel stated that "[i]f law enforcement agents can lay the foundation for their knowledge and so long as there is not any—any testimony—statements in it, then we don't have an objection." While these statements tend to indicate that Foster believed that he and the government had resolved, or at least could resolve, his Confrontation Clause objection through an agreement, Foster notes that the agreement was effectively undermined when the district court later permitted the CI to refuse to answer any questions related to issues upon which he testified in grand jury proceedings.

The record does not conclusively indicate that Foster explicitly withdrew the Confrontation Clause objections presented in his response to the government's motion *in limine*. Unlike the defendant in *Pittman*, Foster not only *reserved* the right to file a responsive brief detailing his objections; he actually filed a response to the government's motion *in limine* outlining his precise objections. And unlike the defendant in *Cooper*, Foster never explicitly withdrew his response to the government's motion *in limine*. In addition, his statement that "so long as there is not any—any testimony—statements in it, then we don't have an objection," can reasonably be understood as referring to continuing Confrontation Clause concerns regarding the admission of testimonial

statements at trial. Foster's statements during the pretrial conference regarding his objections were conditional in nature, suggesting only that *if* testimonial statements were removed from the recorded conversations, he would not have Confrontation Clause objections. Such statements do not amount to an explicit withdrawal of the objection signaling that he intentionally abandoned the issue. Thus, because the court issued a final ruling on the motion *in limine*, determining that the recorded conversations were admissible, Foster did not need to raise another objection to preserve the issue for appellate review. *See United States v. Schalk*, 515 F.3d 768, 776 (7th Cir. 2008) ("A definitive, unconditional ruling *in limine* preserves an issue for appellate review, without the need for later objection.") (internal citation omitted). Foster has not waived these arguments.

The government argues that even if Foster did not waive his Confrontation Clause objection, he at least forfeited the argument. The government notes that the "specific ground for reversal of an evidentiary ruling on appeal must . . . be the same as that raised at trial," *United States v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007), and suggests that the only ground raised below was foundational. Because, in its view, Foster failed to object to the admission of the recorded conversations on Confrontation Clause grounds below, the government claims that the forfeited objection requires only plain error review. *See Schalk*, 515 F.3d at 776.

However, the government advances no additional arguments, beyond those expressed in support of its waiver claim, demonstrating that Foster failed to raise

his Confrontation Clause objection below. Indeed, the government acknowledges that Foster raised Confrontation Clause concerns in his response to the government's motion *in limine*. Accordingly, the government's suggestion that "no objection was made that would put the district court (and the other party) on notice of the objecting party's concern," *Shalk*, 515 F.3d at 776, is unpersuasive. The government's claim that Foster forfeited the argument such that plain error presents the appropriate standard of review is therefore unavailing.

While evidentiary rulings generally are reviewed for abuse of discretion, *see e.g.*, *United States v. Hosseini*, 679 F.3d 544, 556 (7th Cir. 2012), we "review de novo a district court ruling that affects a defendant's Sixth Amendment rights," *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007) (internal citation omitted). Because Foster neither waived nor forfeited his Confrontation Clause objection, we analyze his claim de novo.

### (ii) Non-testifying CI

Foster argues that the government offered the non-testifying CI's recorded statements for their truth. Accordingly, he suggests that the statements are hearsay and that their admission violated the Confrontation Clause. Hearsay is not admissible unless "a federal statute, these rules, or other rules prescribed by the Supreme Court provide otherwise." Fed. R. Evid. 802. Even if hearsay is admissible under the Federal Rules of Evidence, the Confrontation Clause may pose a bar to its admission. We have explained that in the context of the admission of

testimonial hearsay in criminal trials,"the Sixth Amend-
ment's Confrontation Clause bars the admission of such
testimonial statements unless the declarant is unavailable
and the defendant had a prior opportunity for cross-
examination." *United States v. Bermea-Boone*, 563 F.3d
621, 625 (7th Cir. 2009) (quoting *United States v. Tolliver*,
454 F.3d 660, 664-65 (7th Cir. 2006) (citing *Crawford v.
Washington*, 541 U.S. 36, 68 (2004))). However, where
"there is no hearsay, the concerns addressed in *Crawford*
do not come in to play," *id.* at 626 (internal citation omit-
ted), as the Confrontation Clause "does not bar the use
of testimonial statements for purposes other than estab-
lishing the truth of the matter asserted." *Crawford*, 541
U.S. at 59 n. 9.

The admission of recorded conversations between
informants and defendants is permissible where an in-
formant's statements provide context for the defendant's
own admissions. "[S]tatements providing context for
other admissible statements are not hearsay because
they are not offered for their truth." *United States v. Van
Sach*, 458 F.3d 694, 701 (7th Cir. 2006); *see also United
States v. York*, 572 F.3d 415, 427 (7th Cir. 2009) ("[P]laying
the tapes of those conversations for the jury does not
violate the Confrontation Clause so long as those tapes
are offered to provide context for the defendant's own
admissions."); *Nettles*, 476 F.3d at 517 ("[W]hen statements
are merely offered to show context, they are not being
offered for the truth of the matter asserted, and therefore,
*Crawford* does not require confrontation."). In *United
States v. Gaytan*, for example, the government intro-
duced recordings at trial of two controlled purchases

conducted using a CI, without calling the CI as a witness. 649 F.3d 573, 576 (7th Cir. 2011). On appeal, we rejected a challenge on hearsay and Confrontation Clause grounds to the admissibility of the CI's recorded statements, explaining that the "government offered the challenged statements not for their truth but to put [the defendant's] own words in context and to help the jury make sense of [the defendant's] reaction to what [the CI] said and did." *Id.* at 580. The *Gaytan* court noted, however, that a CI's out-of-court statements "might implicate the Confrontation Clause if the circumstances suggest that the informant used those statements to 'put words into [a defendant's] mouth.'" *Id.* (quoting *Nettles*, 476 F.3d at 518).

Foster claims that the admission of several of the CI's recorded statements constitute *Crawford* violations. Regarding the February 12, 2009 controlled purchase, Foster argues that the CI's recorded statements, "[t]hat's 56. Supposed to be 60" and "4 grams. For . . . 56. Quantity is off" are hearsay. He suggests that these statements were offered as proof that Foster actually provided 56 grams of cocaine, that the CI was actually weighing that cocaine, and that the quantity was in fact off. The government counters that these statements were instead simply relevant to provide context for the defendant's admissions, suggesting that in the absence of the CI's statements, the defendant's statements which followed would have been unintelligible to the jury.

According to the transcripts, the statements were made in the following context: the defendant had

entered the CI's vehicle and asked the CI if he had "brought the scale," explaining that he could "weigh it" when the drugs arrived. Upon returning to the vehicle (allegedly with the drugs), the defendant stated: "Alright. He said give him 17 . . . for that, man. That's two. Two whole." The deal was for two ounces. The CI then allegedly weighed the drugs and determined that they were four grams short, which prompted the CI to say "That's 56. Supposed to be 60" and claim that the quantity was off. In response, the defendant lowered the price from seventeen hundred dollars to sixteen fifty, stating "Give me sixteen fifty. That's why I say 17 . . . It's originally 17."

Here, the CI's statement regarding the weight was not offered to show what the weight *actually* was or was supposed to be (the exact number is immaterial), but rather to explain the defendant's acts and make his statements intelligible. The defendant's statement to "give [him] sixteen fifty" (because the original price was 17) would not have made sense without reference to the CI's comment that the quantity was off. Because the statements were admitted only to provide context, *Crawford* does not require confrontation.

Regarding the February 24, 2009 recorded statements, Foster challenges the admission of the following statements by the CI:

> Uh you know, last time the quality was alright, just the qual . . . I mean the quantity, not the qual . . . the quality was fine, but just the quantity, you know . . . . We just need, you know, go to get the weight correct."

In response to these comments by the CI, Foster said, "they liked it? Okay good," and then said that the weight would be correct this time: "He's got it right. He better have it right." Foster argues that these statements were hearsay because they were utilized in the government's closing argument and to show that Foster was guilty of the offense charged. Here again, the recorded statements were offered to provide context: the statements were not offered to show that the drugs were actually of a high quality (the truth of the matter asserted). Rather, they were used to clarify the defendant's responses for the jury, including his focus on ensuring that his supplier provided the right quantity on that occasion. Whether the quantity actually was correct is again immaterial.

Regarding the March 20, 2009 transaction, Foster challenges the admission of the following statements made by the CI:

> Look at me countin' this 'cause when he comes here, I'm gonna weigh it, I'm gonna get up outta here. Look[.] Look.

and

> [S]ee about the weight before you go anywhere. Well it's supposed to be (UI).

These statements were made while the CI was in the car with the defendant and expressing anxiety about the wait for the defendant's supplier. The statements were offered to help the jury understand Foster's statements, signaling that defendant's comments, "[w]ell how

much this?" and "I wasn't watchin," refer to the CI's payment for the delivery and the notion that he did not know how much money the CI was giving him because he hadn't watched him count it. Foster argues that the statements were offered to prove that the CI had money for Foster and that Foster had cocaine in his possession. However, Foster's statements would have been unintelligible without reference to the CI's statements; for example, jurors would be at a loss as to what the defendant "wasn't watching." The CI's statements were offered only to provide context.

Finally, with respect to the April 2, 2009 transaction, Foster challenges the admission of the following statements made by the CI:

> See because that, that's the reason I wanted to, uh, you know, meet him. Not, not to cut you out. I would still pay you, still come through you . . . I call you this number, tell you deliver a quarter ounce. You know, give it, you give him the price, he pays you. You know, you pay the money, be delivered to me to you, but he be (UI) there (UI) have nothin' to do with this shit.

These statements formed part of a longer conversation between the CI and Foster concerning Foster's dealings with his supplier and the delivery delays. Foster explained that the delays were not his fault because the supplier had told him that he was on his way. Apparently, the defendant and the CI waited a long time for the supplier to arrive for the delivery, and after one hour, the CI and Foster began arguing about how long

the deal was taking. Foster argues that these state-ments show how the CI would prefer to conduct transac-tions with the defendant. However, the statements were offered to provide relevant background to the de-fendant's responses, enabling the jurors to comprehend the conversation as a whole. The defendant's responses to these comments by the CI were brief (e.g., "say that again" and "To where? Deliver where?") and would be unintelligible absent the full context. Because the challenged statements were offered only to provide context, *Crawford* does not require confrontation.

Unlike the concerns this court described in *Nettles*, the aforementioned recorded statements do not amount to instances of the CI "put[ting] words in [the defendant's] mouth." 476 F.3d at 518. Nor did the CI's recorded state-ments "try to persuade [the defendant] to commit more crimes in addition to those that [defendant] had already decided to commit." *Id.* at 518. Here, as in *Gaytan*, "the government offered the challenged statements not for their truth but to put [the defendant's] own words in context and to help the jury make sense out of his reaction to what [the CI] said and did." 649 F.3d at 580. Further, the jury was provided with instructions by the court indicating that the CI's recorded state-ments were not to be considered for the truth of the matter asserted, but instead only to provide context for the defendant's admissions. *See Van Sachs*, 458 F.3d at 701-02 (district court's limiting instruction relevant to determination that Confrontation Clause rights were not violated). Because "there is no hearsay, the concerns

addressed in *Crawford* do not come in to play." *Bermea-Boone*, 563 F.3d at 626. The district court's admission of these recorded statements was not in error.

### (iii)   ATF Agents

Foster also argues that the admission of testimony from various ATF agents violated his Confrontation Clause rights. He suggests that the agents' testimony amounted to "the equivalent of" out-of-court statements by the non-testifying CI, which in turn violated his Confrontation Clause rights. He argues that the following statements by various ATF agents elicited vicarious "nonverbal conduct" statements by the CI:

> Prosecutor:   And when you and the confidential informant arrived at the debriefing spot, what, if anything, did the informant give you?

> Agent [Jacob J.] Casali: The informant turned over to me the crack cocaine that had been purchased from the defendant, as well as the transmitter and the electronic scale, at which time I removed the recording device from his vehicle, as well—he also turned over any—any—any unexpended funds.

and

> Prosecutor:   When you and the informant arrived at the debriefing spot, what, if anything, did the informant give you?

> Agent Casali: The informant turned over to me unexpended funds, the narcotics that he had just pur-

chased, the portable electronic scale, the transmitter; and I removed the recording device from his vehicle.

and

Prosecutor: What, if anything, did the informant give you?

Agent Mask: He gave me a package of suspected crack cocaine in a clear plastic bag.

and

Prosecutor: Would you tell us, Special Agent Casali, what you received back from the informant?

Agent Casali: The crack cocaine that he had purchased, the electronic scale, the transmitter, and any unused government funds.

Foster claims that the above statements constitute inadmissible hearsay, relying on *United States v. Walker* for the proposition that "[a] prosecutor surely knows that hearsay results when he elicits from a government agent that 'the informant said he got his gun from X' as proof that X supplied the gun." 673 F.3d 649, 658 (7th Cir. 2012). However, *Walker* involved our finding that the admission of testimony regarding what a CI *told* an agent about the location of a firearm was improper. *See id.* at 658. In the present case, neither Agent Mask nor Agent Casali refer to any out-of-court *statements* by the CI; instead, they only describe their personal actions and observations.

Indeed, the *Walker* court explicitly approved of this sort of testimony, explaining that "[t]he government

was free to elicit through [the agent] that [the CI] had given him the [firearm]." *Id.* Here, the government did just that: it elicited through Agents Casali and Mask that the CI had provided them with drugs, money, a transmitter, and a scale. We have many times determined that testimony regarding an agent's personal observations does not implicate hearsay concerns. *See United States v. Pira*, 535 F.3d 724, 729 (7th Cir. 2008) (noting "the personal observations of [the] Special Agent . . . are not in fact hearsay); *United States v. Bursey*, 85 F.3d 293, 296 (7th Cir. 1996) (explaining that the officer's "testimony about his personal observations of and encounters with [the defendant] during his police work do not qualify as out-of-court 'statements' under the hearsay rules."); *United States v. Gandara*, 586 F.2d 1156, 1158 (7th Cir. 1978) (an agent's testimony regarding facts "within his own personal experience" based on surveillance is not hearsay). The challenged testimony in the present case exclusively concerned the agents' personal observations and actions: the agents personally witnessed the controlled buys, searched the CI before and after each transaction, and followed the CI to the debriefing location after each transaction to collect the drugs, money, and recording equipment. Accordingly, their own actions formed the basis for their testimony, and their testimony did not relay "nonverbal conduct" statements of the CI. The district court's decision to admit such testimony was not in error.

**B. The district court did not err in denying defendant's request for a missing witness instruction**

We review the district court's denial of defendant's request for a missing witness instruction for an abuse of discretion. *United States v. Villegas*, 655 F.3d 662, 669-70 (7th Cir. 2011); *United States v. Morris*, 576 F.3d 661, 672 (7th Cir. 2009) ("We review the district court's refusal to give a jury instruction for an abuse of discretion.") (internal citation omitted). "The district court has broad discretion in deciding whether to give a missing witness instruction, and we will disturb that decision only where serious error has occurred." *United States v. Christ*, 513 F.3d 762, 773 (7th Cir. 2008) (internal citation omitted). However, where a district court denies a missing witness instruction because it concludes that such an instruction is inappropriate as a matter of law, we review that decision de novo. *United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir 2010). In the present case, while Foster suggests that de novo review is appropriate, he has not advanced an argument that the district court determined that the missing witness instruction "was inappropriate as a matter of law." *Id.* The district court below stated that it was denying the instruction based on "all the circumstances." Thus, we review for abuse of discretion.

"The missing witness instruction is disfavored by this circuit, but a district court has discretion to give it in unusual circumstances." *Id.* at 904 (citing *United States v. DiSantis*, 565 F.3d 354, 364 (7th Cir. 2009)). To "establish entitlement to a missing witness instruction, a de-

fendant must prove two things: first, that the absent witness was peculiarly within the government's power to produce; and second, that the testimony would have elucidated issues in the case and would not merely have been cumulative." *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005) (quoting *United States v. Valles*, 41 F.3d 355, 360 (7th Cir. 1994)).

Two business days before trial, Foster stated on the record that he intended to call the CI to testify, although a trial subpoena for the CI's testimony had not yet been issued. By then, the government had relocated the CI out of state because of potential threats to his safety but nevertheless agreed to accept service of the subpoena and to produce the witness in court to testify for the defense. That evening, after the government noticed discrepancies regarding the amount of money the CI claimed he had paid Foster for the crack cocaine, the government met with the CI. It notified the CI that the defense intended to call him as a witness and that he would be served with a trial subpoena which would require him to appear in court. It also informed him that failure to appear could be grounds for contempt and that the court might issue a warrant for his arrest.

After confronting him about the discrepancy, the CI ultimately admitted that he had skimmed some of the buy money the agents had given him for the controlled transactions. The government notified the defense immediately that night and the district court the following day. The CI then sought out an attorney, who stated that if the CI were called to testify, he would assert his

Fifth Amendment privilege against self-incrimination. After hearing arguments from counsel for the CI as well as the defense (the government took no position) and confirming that the government would not immunize the CI, the district court determined that the CI could not be compelled to testify regarding matters touched upon during the grand jury proceedings. The defense then asked for a missing witness instruction, which the court denied.

The district court did not abuse its discretion in denying Foster's request for a missing witness instruction. Foster correctly notes that in the past we have found that where "[o]nly the confidential informant actually observed what happened during the controlled buys" a CI's testimony would "certainly have been relevant." *Tavarez*, 626 F.3d at 905. Thus, the CI's testimony in this case arguably would have been relevant, and Foster further suggests that the defense would have been able to elicit non-cumulative testimony regarding the discrepancies between the CI's grand jury testimony and his statements to federal agents. However, even assuming Foster has established that such testimony would have been relevant and non-cumulative, the district court correctly rejected Foster's request for a missing witness instruction because the witness was not peculiarly within the government's power to produce.

A "witness is peculiarly within the government's power to produce when the witness is physically available only to the government, or where the witness's relationship with the government makes his testimony, in pragmatic

terms, available only to the government." *Christ*, 513 F.3d 762, 773 (7th Cir. 2008) (internal citation omitted). "The mere fact that [a witness] was a government informant does not inevitably establish that he was pragmatically available to testify only on behalf of the prosecution." *United States v. Rollins*, 862 F.2d 1282, 1298 (7th Cir. 1988) (internal citation omitted). While Foster acknowledges that the government's ability to grant immunity does not make a witness who invokes the Fifth Amendment privilege peculiarly available to the government, *see United States v. St. Michael's Credit Union*, 880 F.2d 579, 598 (1st Cir. 1989), he argues that an exception exists where there is a clear abuse of prosecutorial discretion violating the due process clause. *See United States v. Flomenhoft*, 714 F.2d 708, 713 (7th Cir. 1983). "Such an abuse of discretion occurs when a prosecutor intends to use his authority under the immunity statute to distort the judicial fact-finding process." *United States v. Taylor*, 728 F.2d 930, 935 (7th Cir. 1984) (internal citation omitted).

Foster argues that the government's actions amounted to a clear abuse of prosecutorial discretion that violated the due process clause. Specifically, he suggests that the government intimidated the CI through interrogation so that he would not testify at trial. Foster points out that ATF agents demanded that the CI "come clean," and warned him about perjury and prosecution, as well as the consequences of lying to the government. The CI ultimately admitted to skimming money from the transactions and at one point began rambling incoherently. Upon being questioned by the government

regarding the details of these incidents, the CI eventually pushed himself away from the table and collapsed. Paramedics were called and he was not left alone that evening out of concern for his health.

While these facts are undoubtedly dramatic, there is no evidence that the government intentionally sought to distort the judicial fact-finding process. The district court determined that the witness was equally unavailable to both parties, explaining that "[e]verything that is in the record in this case as far as I can see points to the fact that the government was as surprised as anyone to hear from the confidential informant when he was interviewed just prior to trial that he had, in fact, been cheating the government out of money." The government's relationship with the CI undoubtedly diverged after his admitted misconduct, at which point it cannot be said that their former employment relationship rendered him exclusively within the government's control. Further, "Congress has conferred the power to immunize witnesses uniquely upon the executive branch." *Flomenhoft*, 714 F.2d at 713. And as we have explained before, "[r]equiring a missing witness instruction each time the prosecution decides not to immunize a witness would constitute a substantial judicial encroachment upon prosecutorial discretion." *Id.* at 714. Indeed, "[t]he immunization statutes are not designed to benefit defendants." *Id.* at 713. The CI committed at least one serious federal offense; the government's decision not to grant him immunity does not amount to a clear abuse of prosecutorial discretion or an effort to manipulate the fact-finding process. Because Foster has failed to

establish that the CI was peculiarly within the power of the government to produce, the district court did not err in denying the missing witness instruction.

### C. The district court's error in not applying the Fair Sentencing Act was harmless

Foster argues that the district court's error in not applying the Fair Sentencing Act ("FSA") requires a remand. We review questions of law affecting sentencing de novo. *See United States v. Powell*, 652 F.3d 702, 710 (7th Cir. 2011) (reviewing de novo a defendant's argument that his sentence was imposed in violation of the Fair Sentencing Act). Below, the district court ruled that it would not apply the FSA because all of the defendant's underlying criminal conduct occurred between February and April 2009, before the FSA was passed.

In *Dorsey v. United States*, 132 S. Ct. 2321 (2012), the Supreme Court held that the FSA's statutory penalties apply to defendants sentenced after the statute's effective date of August 3, 2010, even if their offense conduct occurred prior to August 3, 2010. The government accordingly acknowledges that under *Dorsey*, because Foster was sentenced on August 1, 2011 (after the statute's effective date), the district court erred by not applying the FSA. Under the FSA, Foster's mandatory minimum sentence would have been 5 years, which would have doubled to 10 years based on the career-offender enhancement the government filed. Without the application of the FSA, Foster was subject to a 10-year mandatory minimum, doubled to 20 years in light of

the enhancement applied by the government. The district court sentenced defendant to 20 years' imprisonment for each of Counts One, Two, Four, and Six, all to run concurrently.

Under the FSA, for Count One the defendant's supervised release range was 6 years up to life; for Counts Two, Four, and Six, the defendant's supervised release range was 8 years up to life. Under the pre-FSA guidelines, Foster's supervised release range for Count One was 8 years up to life; for Counts Two, Four, and Six, his supervised release range was 10 years to life. The district court imposed a 10-year term of supervised release, consisting of a term of 8 years on Count One and 10 years on each of Counts Two, Four and Six. Foster now asks that this sentence be vacated and remanded so that the district court may consider the application of the FSA.

While the government acknowledges that under *Dorsey* the defendant should have been sentenced within the statutory penalties set by the FSA, it argues that a remand is not necessary because the error was harmless. *See United States v. Hill*, 645 F.3d 900, 912 (7th Cir. 2011) ("When we are convinced that the sentence would have been the same absent the error, we deem the error harmless.") (internal citation omitted); *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008) (noting that before remanding a case, the court must determine whether an error was harmless). To this end, the government identifies language from the sentencing transcript indicating that the district court would

have imposed the same sentence regardless of the applicability of the FSA. In response to the government asking the district court to clarify whether under 18 U.S.C. § 3553(a) it would impose the same sentence if it had sentenced the defendant under the FSA, the court said:

> This is the sentence I would impose whether the Fair Sentencing Act applied or not. It's a sentencing based upon the 3553 factors that I indicated, my reading of the defendant's history, the specifics of this particular crime, the need to deter any future crimes, which, with this defendant, means incarceration and nothing else because nothing else has worked, and the need to protect the public, his many victims across four states. That's what it is based on. I have found the total offense level of 37, Criminal History Category VI, with a guidelines range of 360 months to life is the appropriate determination in this case. But under either guideline determination, applying the FSA or not, this is the sentence I would impose.

In addition, the fact that the pre-FSA and FSA sentencing frameworks yielded different statutory mandatory minimums was explained to the district court (though the fact that the FSA also changed the mandatory minimum supervised released terms was not explained to the court).

We have in the past found that where the district court indicates that it would have imposed the same sentence regardless of any sentencing error, the error is harmless and a remand is not required. For example, in *United*

*States v. Abbas*, we determined that a sentencing error was harmless because the sentencing judge said that she would have imposed the same sentence even if the Guideline at issue did not apply. 560 F.3d 660, 667 (7th Cir. 2009). In *Anderson*, we likewise concluded that the error in calculating the sentencing range was harmless because the district court explicitly stated that it would impose the same sentence even if its Guidelines calculations were incorrect. 517 F.3d at 965. We subsequently explained that the "common thread in both *Anderson* and *Abbas* is that the sentencing court firmly indicated that it would impose the same sentence regardless of any sentencing error." *United States v. Zahursky*, 580 F.3d 515, 528 (7th Cir. 2009). Thus, the district court's statement that it would have imposed the same sentence regardless of the FSA's application in this case indicates that the error was harmless. Further, the district court's statement "was not just a conclusory comment tossed in for good measure," but rather reflected a "detailed explanation of the basis for the parallel result." *Hill*, 645 F.3d at 912 (quoting *Abbas*, 560 F.3d at 667). Here, the court explained which specific § 3553(a) factors influenced its decision, including the defendant's history, the particular crime in question, the need for deterrence, the need to protect the public, and the defendant's many victims. Because the district court explicitly stated that it would have applied the same sentence regardless of the FSA's application, instead basing its determination on the § 3553(a) factors, the error was harmless. A remand is unnecessary.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the defendant's conviction and sentence.